JOHN INGLIS, DEMANDANT *vs.* THE TRUSTEES OF THE SAILOR'S SNUG HARBOUR IN THE CITY OF NEW YORK.

The testator gave all the rest and residue and remainder of his estate, real and personal, comprehending a large real estate in the city of New York, to the chancellor of the state of New York, and recorder of the city of New York, &c. (naming several other persons by their official description), to have and to hold the same unto them and their respective successors in office to the uses and trusts, subject to the conditions and appointments declared in the will; which were; out of the rents, issues and profits thereof, to erect and build upon the land upon which he resided, which was given by the will, an asylum, or marine hospital, to be called " the Sailor's Snug Harbour," for the purpose of maintaining and supporting aged, decrepid and worn out sailors, &c. And after giving directions as to the management of the fund by his trustees, and declaring that the institution created by his will should be perpetual, and that those officers and their successors should for ever continue the governors thereof, &c. he adds, " it is my will and desire that if it cannot legally be done according to my above intention, by them, without an act of the legislature, it is my will and desire that they will as soon as possible apply for an act of the legislature to incorporate them for the purpose above specified; and I do further declare it to be my will and intention, that the said rest, residue, &c. of my estate should be at all events applied for the uses and purposes above set forth; and that it is my desire all courts of law and equity will so construe this my said last will as to have the said estate appropriated to the above uses, and that the same should in no case, for want of legal form or otherwise, be so construed as that my relations, or any other persons, should heir, possess or enjoy my property, except in the manner and for the uses herein above specified."

Within five years after the death of the testator, the legislature of the state of New York, on the application of the trustees, also named as executors of the will, passed a law constituting the persons holding the offices designated in the will, and their successors, a body corporate, by the name of " the Trustees of the Sailors Snug Harbour," and enabling them to execute the trusts declared in the will.

This is a valid devise to divest the heir of his legal estate, or at all events to affect the lands in his hands with the trust declared in the will.

If, after such a plain and unequivocal declaration of the testator with respect to the disposition of his property, so cautiously guarding against and providing for every supposed difficulty that might arise, any technical objection shall now be interposed to defeat his purpose; it will form an exception to what we find so universally laid down in all our books as a cardinal rule in the construction of wills, that the intention of the testator is to be sought after and carried into effect. If this intention cannot be carried into effect precisely in the mode at first contemplated by him, consistently with the rules of law, he has provided an alternative, which with the aid of the act of the legislature must remove every difficulty.   [113]

[Inglis *vs.* The Trustees of the Sailor's Snug Harbour.]

In the case of "The Baptist Association *vs.* Hart's Executors," 4 Wheat. 27, the court considered the bequest void for uncertainty as to the devisees, and the property vested in the next of kin, or was disposed of by some other provisions of the will. If the testator in that case had bequeathed the property to the Baptist association, on its becoming thereafter and within a reasonable time incorporated, could there be a doubt but that the subsequent incorporation would have conferred on the association the capacity of taking and managing the fund? [114]

Whenever a person by will gives property, and points out the object, the property, and the way in which it shall go, a trust is created, unless he shows clearly, that his desire expressed, is to be controlled by the trustee, and that he shall have an option to defeat it. [119]

What are the rights of the individuals composing a society, and living under the protection of the government, when a revolution occurs, a dismemberment takes place, and when new governments are formed, and new relations between the government and the people are established. A person born in New York before the 4th of July 1776, and who remained an infant with his father in the city of New York, during the period it was occupied by the British troops; his father being a royalist and having adhered to the British government, and left New York with the British troops, taking his son with him, who never returned to the United States, but afterwards became a bishop of the episcopal church in Nova Scotia; such a person was born a British subject, and continued an alien, and is disabled from taking land by inheritance in the state of New York. [126]

If such a person had been born after the 4th of July 1776, and before the 15th of September 1776, when the British troops took possession of the city of New York and the adjacent places, his infancy incapacitated him from making an election for himself, and his election and character followed that of his father; subject to the right of disaffirmance in a reasonable time after the termination of his minority; which never having been done, he remained a British subject, and disabled from inheriting land in the state of New York. [126]

The rule as to the point of time at which the American *ante nati* ceased to be British subjects differs in this country and in England, as established by the courts of justice in the respective countries. The English rule is to take the date of the treaty of peace in 1783. Our rule is to take the date of the declaration of independence. [121]

The settled doctrine in this country is, that a person born here, but who left the country before the declaration of independence, and never returned here, became an alien and incapable of taking lands subsequently by descent. The right to inherit depends upon the existing state of allegiance at the time of the descent cast. [121]

The doctrine of perpetual allegiance is not applied by the British courts to the American *ante nati;* and this court, in the case of Blight's Lessee *vs.* Rochester, 7 Wheat. 544, adopted the same rule with respect to the rights of British subjects here. That although born before the revolution, they are equally incapable with those born subsequent to that event of inheriting or transmitting the inheritance of lands in this country. [121]

The British doctrine therefore is, that the American *ante nati,* by remaining in America after the peace, lost their character of British subjects; and our doctrine is, that by withdrawing from this country, and adhering to the British

government, they lost, or perhaps more properly, speaking, never acquired the character of American citizens. [122]

The right of election must necessarily exist in all revolutions like ours, and is well established by adjudged cases. [122]

This court in the case of M'Ilvaine's Lessee *vs.* Coxe, 4 Cranch, 211, fully recognized the right of election; but they considered that Mr Coxe had lost that right by remaining in the state of New Jersey, not only after she had declared herself a sovereign state, but after she had passed laws by which she declared him to be a member of, and in allegiance to the new government. [124]

Allegiance may be dissolved by the mutual consent of the government and its citizens or subjects. The government may release the governed from their allegiance. This is even the British doctrine. [125]

C. B. by her last will and testament devised " all her estate, real and personal, wheresoever and whatsoever, in law or equity, in possession, reversion, remainder or expectancy, unto her executors and to the survivor of them, his heirs and assigns for ever," upon certain designated trusts: under the statute of wills of the state of New York, (1 N. Y. Revised Laws, 364,) all the rights of the testator to real estate, held adversely at the time of the decease of the testator, passed to the devisees by this will. [127]

It is the uniform rule of this court with respect to the title to real property, to apply the same rule which is applied in state tribunals in like cases. [127]

The right of an absent and absconding debtor to real estate held adversely, passed to and became vested in the trustees by the act of the legislature of New York passed April 4, 1786, entitled " an act for relief against absconding and absent debtors." [131]

In a writ of right the tenant may, on the mise joined, set up a title out of himself and in a third person. If any thing which fell from this court in the case of Greene *vs.* Liter, 8 Cranch, 229, can be supposed to give countenance to the opposite doctrine, it is done away by the explanation given by the court in Greene *vs.* Watkins, 7 Wheaton, 31. It is there laid down that the tenant may give in evidence the title in a third person for the purpose of disproving the demandant's seisin: that a writ of right does bring into controversy the mere right of the parties to the suit; and if so, it by consequence authorises either party to establish by evidence that the other has no right whatever in the demanded premises; or that his mere right is inferior to that set up against him. [133]

In a writ of right on the mise joined on the mere right, under a count for the entire right, a demandant may recover a less quantity than the entirety. [135]

THIS case came before the court at January term 1829, from the circuit court of the United States for the southern district of New York: on points of disagreement certified by the judges of that court. After argument by counsel, it was held under advisement until the present term.

It was a writ of right, brought in the circuit court, for the recovery of certain real estate situate in the city of New York, whereof Robert Richard Randall died seised and possessed.

The count was upon the seisin of Robert Richard Randall, and went for the whole premises.

Paul R. Randall and Catherine Brewerton, a brother and sister of Robert Richard Randall, both survived him, but had since died, without issue.

The demandant claimed his relationship to Robert Richard Randall, through Margaret Inglis, his mother, who was a descendant of John Crooke, the common ancestor of Robert Richard Randall, Catherine Brewerton, and Paul R. Randall.

The tenants put themselves upon the grand assize, and the mise was joined upon the mere right.

The cause was tried at October term 1827.

The counsel for the tenants began with the evidence, and showed that they had been in possession for a number of years, claiming and holding the land as owners.

The seisin of Robert Richard Randall was then proved, and that he purchased from one baron Poelnitz. The genealogy of the demandant as next collateral heir of Robert R. Randall on the part of his mother, and that the blood of Thomas Randall, the father of Robert Richard Randall, was extinct, was proved.

It was in evidence that the British troops entered into New York on the 15th of September 1776, and took and had full possession thereof, and of the adjacent bays and islands, and established a civil government there under the authority of the British commander in chief.

Evidence was given to prove that the demandant was not more than one year old when the British troops entered the city of New York, where he was born; that the father of the demandant was a native of Ireland, and had resided for some time in New York, and continued to reside there until he left there for England, on the day of or the day before the evacuation of New York, the 25th of November 1783. He took the demandant with him to England, remained there two years, was appointed a bishop, and went to Nova Scotia in 1785 or 1786, and there resided until his death. The mother of the demandant died in New York on the 21st of September 1783, a little while before the evacuation thereof by the British troops. It was always considered by a witness

who testified in the cause, that Charles Inglis, the father of the demandant, was a royalist. The demandant was certainly born before the year 1779; in 1783 he could not speak plainly, and was considered not more than five years old, between four and five. He took his degree of master of arts in England, was there ordained a clergyman; his place of residence from the time he first arrived at Nova Scotia was with his father, and he has continued to reside there ever since. He went to England to be consecrated a bishop; which character he now holds, being bishop of Nova Scotia. Charles Inglis, the father of the demandant, had four children, the eldest of which, a son, died an infant, 20th of January 1782, two daughters, and the demandant, who was the youngest child.

The following proceedings of a convention of the state of New York, before the British entered the city, were in evidence.

*Tuesday Afternoon, July* 16*th,* 1776.

Present, general Woodhull president, and the members of the convention.

Whereas, the present dangerous situation of this state demands the unremitted attention of every member of the convention : Resolved unanimously, that the consideration of the necessity and propriety of establishing an independent civil government be postponed until the first day of August next, and that in the meantime,

" Resolved unanimously, that all magistrates and other officers of justice in this state, who are well affected to the liberties of America, be requested, until further orders, to exercise their respective offices, provided, that all processes, and other their proceedings, be under the authority and in the name of the state of New York.

" Resolved unanimously, that all persons abiding within the state of New York, and deriving protection from the laws of the same, owe allegiance to the said laws, and are members of the state : and that all persons passing through, visiting, or making a temporary stay in said state, being entitled to the protection of the laws during the time of such

passage, visitation, or temporary stay, owe, during the same, allegiance thereto.

" That all persons, members of or owing allegiance to this state, as before described, who shall levy war against the said state, within the same, or be adherent to the king of Great Britain, or others, the enemies of the said state, within the same, giving to him or them aid or comfort, are guilty of treason against the state, and being thereof convicted, shall suffer the pains and penalties of death."

The tenants gave in evidence the acts of the legislature of New York: " For the forfeiture of the estates of persons who adhered to the enemies of the state," &c. passed the 22d of October 1779; the " act supplementary to the act to provide for the temporary government of the southern part of this state," &c. passed the 23d of October 1779; and the supplement thereto, passed the 27th of March 1783.

Robert Richard Randall died in the city of New York between the 1st of June and the 1st of July 1801, having on the 1st of June of that year made his last will and testament; probate of which was regularly made in the city of New York.

The provisions of the will of Robert Richard Randall under which the tenants claimed their title are the following.

" 6. As to and concerning all the rest, residue and remainder of my estate, both real and personal; I give, devise and bequeath the same unto the chancellor of the state of New York, the mayor and recorder of the city of New York, the president of the chamber of commerce in the city of New York, the president and vice president of the marine society of the city of New York, the senior minister of the episcopal church in the said city, and the senior minister of the presbyterian church in the said city, to have and to hold all and singular the said rest, residue, and remainder of my said real and personal estate, unto them the said chancellor of the state of New York, mayor of the city of New York, the recorder of the city of New York, the president of the chamber of commerce, president and vice president of the marine society, senior minister of the episcopal church, and

[Inglis vs. The Trustees of the Sailor's Snug Harbour.]

senior minister of the presbyterian church in the said city, for the time being, and their respective successors in the said offices forever, to, for, and upon the uses, trusts, intents and purposes, and subject to the directions and appointments hereinafter mentioned and declared concerning the same, that is to say, out of the rents, issues and profits of the said rest, residue, and remainder of my said real and personal estate, to erect and build upon some eligible part of the land upon which I now reside, an asylum, or marine hospital, to be called "the Sailor's Snug Harbour," for the purpose of maintaining and supporting aged, decrepid, and worn out sailors, as soon as they, my said charity trustees, or a majority of them, shall judge the proceeds of the said estate will support fifty of the said sailors, and upwards; and I do hereby direct, that the income of the said real and personal estate, given as aforesaid to my said charity trustees, shall forever hereafter be used and applied for supporting the asylum, or marine hospital, hereby directed to be built, and for maintaining sailors of the above description therein, in such manner as the said trustees, or a majority of them, may from time, or their successors in office, may from time to time direct. And it is my intention that the institution hereby directed and created should be perpetual, and that the above mentioned officers for the time being, and their successors, should forever continue and be the governors thereof, and have the superintendence of the same. And it is my will and desire, that if it cannot legally be done, according to my above intention, by them, without an act of the legislature, it is my will and desire that they will as soon as possible apply for an act of the legislature to incorporate them for the purposes above specified. And I do further declare it to be my will and intention, that the said rest, residue and remainder of my real and personal estate, should be at all events applied for the uses and purposes above set forth; and that it is my desire all courts of law and equity will so construe this my said will, as to have the said estate appropriated to the above uses, and that the same should in no case, for want of legal form or otherwise, be so construed as that my relations, or any other persons,

should heir, possess, or enjoy my property, except in the manner and for the uses herein above specified.

"And, lastly, I do nominate and appoint the chancellor of the state of New York, for the time being, at the time of my decease; the mayor of the city of New York, for the time being; the recorder of the city of New York, for the time being; the president of the chamber of commerce, for the time being; the president and vice-president of the marine society in the city of New York, for the time being; the senior minister of the episcopal church in the city of New York, and the senior minister of the presbyterian church in the said city, for the time being; and their successors in office after them, to be the executors of this my last will and testament, hereby revoking all former and other wills, and declaring this to be my last will and testament."

It was admitted, that at the time of the decease of Robert Richard Randall, and of the probate of the will, the offices named in the will were respectively filled by different persons, and that they, or some of them, immediately upon the death of the testator, entered upon the premises under the will, claiming to be the owners in fee, until the legislature of New York, on their application, on the 6th of February 1806, passed "an act to incorporate the trustees of the marine hospital, called the Sailor's Snug Harbour, in the city of New York."

Those offices continued to be filled respectively by different persons, from the time of the death of the testator until the time of the trial.

The act incorporating "the trustees of the marine hospital," &c. provides,

Whereas, it is represented to the legislature, that Robert Richard Randall, late of the city of New York, deceased, in and by his last will and testament, duly made and executed, bearing date the 1st day of June, in the year of our Lord 1801, did, after bequeathing certain specific legacies therein mentioned, among other things give and devise and bequeath all the residue of his estate, both real and personal, unto the chancellor of this state, the mayor and recorder of the city of New York, the president of the chamber of com-

merce in the city of New York, the president and vice president of the marine society of the city of New York, the senior minister of the episcopal church in the said city, and the senior minister of the presbyterian church in the said city, for the time being, and to their successors in office respectively, in trust, to receive the rents, issues and profits thereof, and to apply the same to the erecting or building on some eligible part of the land whereon the testator then resided, an asylum, or marine hospital, to be called "the Sailor's Snug Harbour," for the purpose of maintaining and supporting aged, decrepid and worn out sailors, as soon as the said trustees, or a majority of them, should judge the proceeds of the said estate would support fifty of such sailors and upwards; and that the said testator, in his said will, declared his intention to be, that the said estate should at all events be applied to the purposes aforesaid, and no other; and if his said intent could not be carried into effect without an act of incorporation, he therein expressed his desire that the said trustees would apply to the legislature for such incorporation; and, whereas, the said trustees have represented that the said estate is of considerable value, and if prudently managed, will in time enable them to erect such hospital, and carry into effect the intent of the testator; but that as such trustees, and being also appointed executors of the said will, in virtue of their offices, and only during their continuance in the said offices, they have found that considerable inconveniences have arisen in the management of the said estate, from the changes which have taken place in the ordinary course of the elections and appointments to those offices, and have prayed to be incorporated for the purposes expressed in the said will, and such prayer appears to be reasonable: therefore,

1. Be it enacted by the people of the state of New York, represented in senate and assembly, that John Lansing, Jun. the chancellor of this state, De Witt Clinton the mayor, and Maturin Livingston the recorder of the city of New York, John Murray the president of the chamber of commerce of the city of New York, James Farquhar the president, and Thomas Farmer the first vice president of the marine so-

ciety of the city of New York, Benjamin Moore, senior minister of the episcopal church in the said city; and John Rogers, senior minister of the presbyterian church in the said city, and their successors in office respectively, in virtue of their said offices; shall be, and hereby are constituted and declared to be a body corporate, in fact, and in name, by the name and style of the trustees of the Sailor's Snug Harbour in the city of New York; and by that name they and their successors shall have continual succession, and shall be capable in law of suing and being sued, pleading and being impleaded, answering and being answered unto, defending and being defended, in all courts and places whatsoever, and in all manner of actions, suits, complaints, matters and causes whatsoever; and that they and their successors may have a common seal, and may change and alter the same at their pleasure; and also, that they and their successors, by the name and style aforesaid, shall be capable in law of holding and disposing of the said real and personal estate, devised and bequeathed as aforesaid, according to the intention of the said will; and the same is hereby declared to be vested in them, and their successors in office, for the purpose therein expressed; and shall also be capable of purchasing, holding and conveying any other real and personal estate, for the use and benefit of the said corporation, in such manner as to them, or a majority of them, shall appear to be most conducive to the interest of the said institution.

The second section gives to the trustees the power to make rules and regulations, and to appoint officers for the government and business of the corporation, and provides for the mode of transacting the same.

The third section declares that " this act shall be deemed and taken to be a public act, and be construed in all courts and places, benignly and favourably, for the purposes therein intended."

On the 25th of March 1814, an act supplementary to the act of incorporation was passed, declaring, that persons holding certain offices should act as trustees, and declaring it to be the duty of the corporation to make an annual report of

their funds to the common council of the city, or the state of their funds.

The counsel for the tenants gave in evidence the act of the legislature of New York, " for relief against absconding and absent debtors," passed the 4th of April 1786; and a report made to the superior court of judicature of the state of New York, of proceedings under the act against Paul Richard Randall, by which he was declared an absent debtor.

Under this act all the estate, real as well as personal, of Paul Richard Randall, as an absent debtor, of what kind or nature soever the same might be, were, on the 13th of November 1800, attached, seized, and taken, and were, by the recorder of New York, under and in pursuance of the provisions of the law, upon the 22d of December 1801, by an instrument of writing under his hand and seal, conveyed to Charles Ludlow, James Brewerton, and Roger Strong, all of the city of New York; to be trustees for all the creditors of the said Paul Richard Randall, who afterwards duly qualified as trustees.

Subsequently, on the 14th of April 1808, upon a further application to the recorder of New York, Paul Richard Randall being still absent, other trustees are appointed, according to law, who were, on the same day, qualified to act as trustees.

The demandant gave in evidence the following rules of the supreme court of judicature of the people of the state of New York:

*February* 17th, 1804.

" In the matter of Paul Richard Randall, an absent debtor.

" On reading and filing the petition of Alexander Stewart, White Matlack, and Catherine Brewerton, agents and attorneys of the said Paul Richard Randall, and also reading and filing the answer of Charles Ludlow, James Brewerton, and Roger Strong, trustees for all the creditors of the said Paul Richard Randall, to the said petition, and on motion of Mr Hamilton, attorney of the said Alexander Stewart, White Matlack, and Catherine Brewerton, it is ordered by the court, that the said trustees pay to the said Paul Richard Randall,

# SUPREME COURT.

or to his said agents and attorneys, for his use, the sum of five thousand five hundred dollars, out of the moneys now remaining in the hands of the said trustees."

*August 9th,* 1804.

" In the matter of Paul R. Randall, an absent debtor, and his assignees, &c.

" On reading and filing the petition of Alexander Phœnix, the attorney and agent for Paul Richard Randall, together with a certified copy of the power of attorney, and the acknowledgements of the trustees and former attorneys of the said Paul, thereunto annexed, and on motion of Mr Van Wyck, of counsel for the said Alexander, ordered that the rule heretofore, in February term last, made in the said matter, be vacated, and that the said sum of five thousand five hundred dollars, acknowledged to be still remaining in the hands of the said Charles Ludlow, James Brewerton, and Roger Strong, trustees as aforesaid, be paid over by them to the said Alexander Phœnix, as the attorney and agent of the said Paul Richard Randall."

It appeared in evidence, that Catherine Brewerton died some time in or about the year of our Lord 1815, and that Paul R. Randall died some time in the year of our Lord 1820, Catherine Brewerton, having first, while a widow, made her last will and testament, dated the 5th of June A. D. 1815, duly executed and attested to pass real estate, and devised among other things as follows, that is to say :

" Secondly, I give, devise and bequeath, all my estate, real and personal, whatsoever and wheresoever, in law or equity, in possession, reversion, remainder or expectancy, (excepting such as is herein otherwise specially mentioned) unto my executors hereinafter named, and to the survivor of them, his heirs and assigns for ever, upon trust nevertheless for the uses and purposes hereinafter mentioned and intended, that is to say, that my executors shall," &c.

Upon the trial of the cause in the circuit court the judges were opposed in opinion upon the following points, which were certified to the court.

[Inglis *vs.* The Trustees of the Sailor's Snug Harbour.]

I. Whether, inasmuch as the count in the cause is for the entire right in the premises, the demandant can recover a less quantity than the entirety.

II. Whether John Inglis, the demandant, was or was not capable of taking lands in the state of New York by descent, which general question presents itself under the following aspects:

1. Whether, in case he was born before the 4th of July 1776, he is an alien, and disabled from taking real estate by inheritance.

2. Whether, in case he was born after the 4th of July 1776, and before the 15th of September of the same year, when the British took possession of New York, he would be under the like disability.

3. Whether, if he was born after the British took possession of New York, and before the evacuation on the 25th of November 1783, he would be under the like disability.

4. What would be the effect upon the right of John Inglis to inherit real estate in New York, if the grand assize should find that Charles Inglis, the father, and John Inglis, the demandant, did, in point of fact, elect to become and continue British subjects and not American citizens?

III. Whether the will of Catherine Brewerton was sufficient to pass her right and interest in the premises in question, so as to defeat the demandant in any respect; the premises being, at the date of the will and ever since, held adversely by the tenants in this suit.

IV. Whether the proceedings against Paul R. Randall, as an absent debtor, passed his right or interest in the lands in question to, and vested the same in the trustees appointed under the said proceedings, or either of them, so as to defeat the demandant in any respect.

V. Whether the devise in the will of Robert Richard Randall of the lands in question is a valid devise, so as to divest the heir at law of his legal estate, or to affect the lands in his hands with a trust.

The cause was argued by Mr Ogden and Mr Webster, for the demandant, and by Mr Talcott and Mr Wirt, for the

tenants.  The argument was commenced and concluded by the counsel for the tenants.

Mr Justice THOMPSON delivered the opinion of the court.

This case comes up from the circuit court for the southern district of New York, upon several points, on a division of opinion certified by that court.  In the examination of these points, I shall pursue the order in which they have been discussed at the bar.

I. "Whether the devise in the will of Robert Richard Randall, of the lands in question, is a valid devise, so as to divest the heir at law of his legal estate, or to affect the lands in his hands with a trust."

This question arises upon the residuary clause in the will; in which the testator declares : that as to and concerning all the rest, residue, and remainder of my estate, both real and personal, I give, devise and bequeath the same unto the chancellor of the state of New York, the mayor and recorder of the city of New York, &c. (naming several other persons by their official description only) to have and to hold all and singular the said rest, residue and remainder of my said real and personal estate, unto them, and their respective successors in office, for ever, to, for and upon, the uses, trusts, intents and purposes, and subject to the directions and appointments hereinafter mentioned and declared concerning the same, that is to say : out of the rents, issues and profits of the said rest, residue and remainder of my said real and personal estate, to erect and build upon some eligible part of the land upon which I now reside, an asylum, or marine hospital, to be called " the Sailor's Snug Harbour," for the purpose of supporting aged, decrepid, and worn-out sailors, &c.  And after giving directions as to the management of the fund by his trustees, and declaring that it is his intention, that the institution erected by his will should be perpetual, and that the above mentioned officers for the time being, and their successors, should for ever continue to be the governors thereof, and have the superintendence of the same, he then adds, "and it is my will and desire, that if it cannot legally be done, according to my above intention, by them,

without an act of the legislature, it is my will and desire, that they will as soon as possible apply for an act of the legislature to incorporate them for the purposes above specified. And I do hereby declare it to be my will and intention, that the said rest, residue and remainder of my said real and personal estate, should be at all events applied for the uses and purposes above set forth; and that it is my desire all courts of law and equity will so construe this my said will as to have the said estate appropriated to the above uses, and that the same should in no case, for want of legal form or otherwise, be so construed as that my relations, or any other persons, should heir, possess or enjoy my property, except in the manner, and for the uses herein above specified."

The legislature of the state of New York, within a few years after the death of the testator, on the application of the trustees, who are also named as executors in the will, passed a law, constituting the persons holding the offices designated in the will, and their successors in office, a body corporate, by the name and style of "the Trustees of the Sailor's Snug Harbour in the city of New York," and declaring that they and their successors, by the name and style aforesaid, shall be capable in law of holding and disposing of the said real and personal estate, devised and bequeathed as aforesaid, according to the intentions of the aforesaid will. And that the same is hereby declared to be *vested* in them and their successors in office for the purposes therein expressed.

If, after such a plain and unequivocal declaration of the testator with respect to the disposition of his property, so cautiously guarding against, and providing for every supposed difficulty that might arise, any technical objection shall now be interposed to defeat his purpose, it will form an exception to what we find so universally laid down in all our books, as a cardinal rule in the construction of wills, that the intention of the testator is to be sought after and carried into effect. But no such difficulty in my judgment is here presented. If the intention of the testator cannot be carried into effect, precisely in the mode at first contemplated by

VOL. III.—P

him, consistently with the rules of law, he has provided an alternative, which, with the aid of the act of the legislature, must remove all difficulty.

The case of the Baptist Association vs. Hart's executors, 4 Wheat. 27, is supposed to have a strong bearing upon the present. This is however distinguishable in many important particulars from that. The bequest there was, " *to the Baptist Association that for ordinary meets at Philadelphia.*" This association not being incorporated, was considered incapable of taking the trust as a society. It was a devise in presenti, to take effect immediately on the death of the testator, and the individuals composing it were numerous and uncertain, and there was no executory bequest over to the association if it should become incorporated. The court therefore considered the bequest gone for uncertainty as to the devisees, and the property vested in the next of kin, or was disposed of by some other provision in the will. If the testator in that case had bequeathed the property to the Baptist Association on its becoming thereafter, and within a reasonable time incorporated, could there be a doubt but that the subsequent incorporation would have conferred on the association the capacity of taking and managing the fund.

In the case now before the court, there is no uncertainty with respect to the individuals who were to execute the trust. The designation of the trustees by their official character, is equivalent to naming them by their proper names. Each office referred to was filled by a single individual, and the naming of them by their official distinction was a mere designatio personæ. They are appointed executors by the same description, and no objection could lie to their qualifying and acting as such. The trust was not to be executed by them in their official characters, but in their private and individual capacities. But admitting that if the devise in the present case had been to the officers named in the will and their successors, to execute the trust, and no other contingent provision made, it would fall within the case of the Baptist Association vs. Hart's executors.

The subsequent provisions in the will must remove all difficulty on this ground. If the first mode pointed out by the testator for carrying into execution his will and inten-

tion, with respect to this fund, cannot legally take effect, it must be rejected, and the will stand as if it had never been inserted ; and the devise would then be to a corporation, to be created by the legislature, composed of the several officers designated in the will as trustees, to take the estate and execute the trust.

And what objection can there be to this as a valid executory devise, which is such a disposition of lands, that thereby no estate vests at the death of the devisor, but only on some future contingency? By an executory devise, a freehold may be made to commence in futuro, and needs no particular estates to support it. The future estate is to arise upon some specified contingency, and the fee simple is left to descend to the heir at law until such contingency happens. A common case put in the books to illustrate the rule is : if one devises land to a feme sole and her heirs upon her marriage. This would be a freehold commencing in futuro, without any particular estate to support it, and would be void in a deed, though good by executory devise, 2 Black. Com. 175. This contingency must happen within a reasonable time, and the utmost length of time the law allows for this is, that of a life or lives in being and twenty-one years afterwards. The devise in this case does not purport to be a present devise to a corporation not in being, but a devise to take effect in futuro upon the corporation being created. The contingency was not too remote. The incorporation was to be procured, according to the directions in the will, as soon as possible, on its being ascertained that the trust could not legally be carried into effect in the mode first designated by the testator. It is a devise to take effect upon condition that the legislature should pass a law incorporating the trustees named in the will. Every executory devise is upon some condition or contingency, and takes effect only upon the happening of such contingency or the performance of such condition. As in the case put of a devise to a feme sole upon her marriage. The devise depends on the condition of her afterwards marrying.

The doctrine sanctioned by the court in Porter's case, 1 Coke's Rep. 24, admits the validity of a devise to a future in-

corporation. In answer to the argument that the devise of a charitable use was void under the statute 23 Hen. 8, it was said, that admitting this, yet the condition was not void in that case. For the testator devised that his wife shall have his lands and tenements, upon condition that she, by the advice of learned counsel, in convenient time after his death, shall assure all his lands and tenements for the maintenance and continuance of the said free school, and alms men and alms women for ever. So that although the said uses were prohibited by the statute, yet the testator hath devised, that counsel learned should advise, how the said lands and tenements should be assured, for the uses aforesaid, and that may be advised lawfully: viz. To make a corporation of them by the king's letters patent, and afterwards, by license, to assure the lands and tenements to them. So if a man devise that his executors shall, by the advice of learned counsel, convey his lands to any corporation, spiritual or temporal, this is not against any act of parliament, because it may lawfully be done by license, &c. and so doubtless was the intent of the testator, for he would have the lands assured for the maintenance of the free school, and poor, for ever; which cannot be done without incorporation and license, as aforesaid; so the condition is not against law: *quod fuit concessum per curiam.*

The devise in that case could not take effect without the incorporation. This was the condition upon which its validity depended. And the incorporation was to be procured after the death of the testator. The devise then, as also in the case now before the court, does not purport to be a present devise, but to take effect upon some future event. And this distinguishes the present case from that of the Baptist Association *vs.* Hart's executors, in another important circumstance. There it was a present devise, here it is a future devise. A devise to the first son of A. he having no son at that time, is void; because it is by way of a present devise, and the devisee is not *in esse.* But a devise to the first son of A. when he shall have one, is good; for that is only a future devise, and valid as an executory devise. 1 Salk. 226, 229.

The cases in the books are very strong to show, that for the purpose of carrying into effect the intention of the tes-

tator, any mode pointed out by him will be sanctioned, if consistent with the rules of law, although some may fail. In Thellusson *vs.* Woodford, 4 Ves. Jun. 325, Buller, Justice, sitting with the lord chancellor, refers to, and adopts with approbation, the rule laid down by lord Talbot in Hopkins *vs.* Hopkins: that in such cases, (on wills,) the method of the courts is not to set aside the intent because it cannot take effect so fully as the testator desired, but to let it work as far as it can. Most executory devises, he says, are without any freehold to support them; the number of contingencies is not material, if they are to happen within the limits allowed by law. That it was never held that executory devises are to be governed by the rules of law, as to common law conveyances. The only question is, whether the contingencies are to happen within a reasonable time or not. The master of the rolls in that case says, (p. 329,) he knows of only one general rule of construction, equally for courts of equity and courts of law, applicable to wills. The intention of the testator is to be sought for, and the will carried into effect, provided it can be done consistent with the rules of law. And he adds another rule, which has become an established rule of construction. That if the court can see a general intention, consistent with the rules of law, but the testator has attempted to carry it into effect in a way that is not permitted, the court is to give effect to the general intention, though the particular mode shall fail. 1 Peere Wms, 332. 2 Brown's Ch. 51.

The language of Lord Mansfield in the case of Chapman *vs.* Brown, 3 Burr. 1634, is very strong to show how far courts will go to carry into effect the intention of the testator. To attain the intent, he says, words of limitation shall operate as words of purchase; implication shall supply verbal omissions. The letter shall give way, every inaccuracy of grammar, every impropriety of terms, shall be corrected by *the general meaning*, if that be clear and manifest.

In Bartlet *vs.* King, 12 Mass. Rep. 543, the supreme judicial court of Massachusetts adopt the rule laid down in Thellusson *vs.* Woodford, that the court is bound to carry the will into effect if they can see a general intention con-

sistent with the rules of law, even if the particular mode or manner pointed out by the testator is illegal. And the court refer with approbation to what is laid down by Powell in his Treatise on Devises, 421, that a devise is never construed absolutely void for uncertainty, but from necessity: if it be possible to reduce it to certainty it is good. So also in Finlay *vs.* Riddle, 3 Binn. Rep. 162, in the supreme court of Pennsylvania, the rule is recognized, that the general intent must be carried into effect, even if it is at the expense of the particular intent.

A rule so reasonable and just in itself, and in such perfect harmony with the whole doctrine of the law in relation to the construction of wills, cannot but receive the approbation and sanction of all courts of justice; and a stronger case calling for the application of that rule can scarcely be imagined than the one now before the court. The general intent of the testator, that this fund should be applied to the maintenance and support of aged, decrepid and worn out sailors, cannot be mistaken. And he seems to have anticipated that some difficulty might arise, about its being legally done in the particular mode pointed out by him. And to guard against a failure of his purpose on that account, he directs application to be made to the legislature for an incorporation, to take and execute the trust according to his will; declaring his will and intention to be, that his estate should at all events be applied to the uses and purposes aforesaid; and desiring all courts of law and equity so to construe his will, as to have his estate applied to such uses. And to make it still more secure, if possible, he finally directs that his will should in no case, for want of legal form or otherwise, be so construed, as that his relations, or any other persons, should heir, possess or enjoy his property, except in the manner and for the uses specified in his will.

The will looks therefore to three alternatives:

1. That the officers named in the will as trustees, should take the estate and execute the trust.

2. If that could not legally be done, then he directs his trustees to procure an act of incorporation, and vests the estate in it for the purpose of executing the trust.

3. If both these should fail, his heirs, or whosoever should possess and enjoy the property, are charged with the trust.

That this trust is fastened upon the land cannot admit of a doubt. Wherever a person by will gives property, and points out the object, the property, and the way in which it shall go, a trust is created; unless he shows clearly, that his desire expressed is to be controlled by the trustee, and that he shall have an option to defeat it. 2 Ves. Jun. 335.

It has been urged by the demandant's counsel, that these lands cannot be charged with the trust in the hands of the heir, because the will directs that they shall not be possessed or enjoyed, except in the *manner* and for the *uses* specified. That the *manner* and the *use* must concur in order to charge the trust on the land. But I apprehend this is a mistaken application of the term *manner* as here used. It does not refer to the persons who were to execute the trust. But to the mode or manner in which it was to be carried into effect, viz. by erecting upon some eligible part of the land an asylum, or marine hospital, to be called the Sailor's Snug Harbour. And the *uses* were, " for the purpose of maintaining and supporting aged, decrepid and worn out sailors." Whoever therefore takes the land, takes it charged with these uses or trusts, which are to be executed in the manner above mentioned. And if so, there can be no objection to the act of incorporation, and the vesting the title therein declared. It does not interfere with any vested rights in the heir. He has no beneficial interest in the land. And the law only transfers the execution of the trust from him to the corporation, and thereby carrying into effect the clear and manifest intention of the testator. But being of opinion that the legal estate passed under the will, I have not deemed it necessary to pursue the question of trust, and have simply referred to it, as being embraced in the point submitted to this court.

If this is to be considered a devise to a corporation, it will not come within the prohibitions in the statute of wills, 1 Revised Laws, 364. For this act of incorporation is, pro tanto, a repeal of that statute.

Taking this devise therefore in either of the points of view

in which it has been considered, the answer to the question put must be, that it is valid, so as to divest the heir of his legal estate, or at all events, to affect the lands in his hands with the trust declared in the will.

If this view of the devise in the will of Robert Richard Randall be correct, it puts an end to the right and claim of the demandant, and might render it unnecessary to examine the other points which have been certified to this court, had the questions come up on a special verdict or bill of exceptions. But coming up on a certificate of a division of opinion, it has been the usual course of this court to express an opinion upon all the points.

It is not however deemed necessary to go into a very extended examination of the other questions, as the opinion of the court upon the one already considered, is conclusive against the right of recovery in this action.

II. The second general question is, whether John Inglis, the demandant, was or was not capable of taking lands in the state of New York by descent.

This question is presented under several aspects, for the purpose of meeting what at present from the evidence appears a little uncertain, as to the time of the birth of John Inglis. This question as here presented, does not call upon the court for an opinion upon the broad doctrine of allegiance and the right of expatriation, under a settled and unchanged state of society and government. But to decide what are the rights of the individuals composing that society, and living under the protection of that government, when a revolution occurs; a dismemberment takes place; new governments are formed; and new relations between the government and the people are established.

If John Inglis, according to the first supposition under this point, was born before the 4th of July 1776, he is an alien; unless his remaining in New York during the war changed his character and made him an American citizen. It is universally admitted, both in the English courts and in those of our own country, that all persons born within the colonies of North America, whilst subject to the crown of Great Britain, were natural born British subjects, and it

must necessarily follow, that that character was changed by the separation of the colonies from the parent state, and the acknowledgement of their independence.

The rule as to the point of time at which the American *ante nati* ceased to be British subjects, differs in this country and in England, as established by the courts of justice in the respective countries.    The English rule is to take the date of the treaty of peace in 1783.    Our rule is to take the date of the declaration of independence.    And in the application of the rule to different cases, some difference in opinion may arise. The settled doctrine of this country is, that a person born here, who left the country before the declaration of independence, and never returned here, became thereby an alien, and incapable of taking lands subsequently by descent in this country.    The right to inherit depends upon the existing state of allegiance at the time of descent cast.    The descent cast in this case being long after the treaty of peace, the difficulty which has arisen in some cases, where the title was acquired between the declaration of independence and the treaty of peace, does not arise here.    Prima facie, and as a general rule, the character in which the American ante nati are to be considered, will depend upon, and be determined by the situation of the party and the election made at the date of the declaration of independence, according to our rule ; or the treaty of peace according to the British rule.    But this general rule must necessarily be controlled by special circumstances attending particular cases.    And if the right of election is at all admitted, it must be determined, in most cases, by what took place during the struggle, and between the declaration of independence and the treaty of peace. To say that the election must have been made before, or immediately at the declaration of independence, would render the right nugatory.

The doctrine of perpetual allegiance is not applied by the British courts to the American *ante nati*.    This is fully shown by the late case of Doe *vs*. Acklam, 2 Barn. & Cresw. 779.    Chief Justice Abbott says, " James Ludlow, the father of Frances May, the lessor of the plaintiff, was undoubtedly born a subject of Great Britain.    He was born in a part of

America which was at the time of his birth a British colony, and parcel of the dominions of the crown of Great Britain; but upon the fact found, we are of opinion that he was not a subject of the crown of Great Britain at the time of the birth of his daughter. She was born after the independence of the colonies was recognised by the crown of Great Britain, after the colonies had become United States, and their inhabitants generally citizens of those states. And her father by his continued residence in those states manifestly became a citizen of them." He considered the treaty of peace as a release, from their allegiance, of all British subjects who remained there. A declaration, says he, that a state shall be free, sovereign and independent, is a declaration, that the people composing the state shall no longer be considered as subjects of the sovereign by whom such a declaration is made. And this court, in the case of Blight's Lessee *vs.* Rochester, 7 Wheat. 544, adopted the same rule with respect to the right of British subjects here. That although born before the revolution, they are equally incapable with those born subsequent to that event of inheriting or transmitting the inheritance of lands in this country. The British doctrine therefore is, that the American *ante nati*, by remaining in America after the treaty of peace, lost their character of British subjects. And our doctrine is, that by withdrawing from this country, and adhering to the British government they lost, or, perhaps more properly speaking, never acquired the character of American citizens.

This right of election must necessarily exist, in all revolutions like ours, and is so well established by adjudged cases, that it is entirely unnecessary to enter into an examination of the authorities. The only difficulty that can arise is, to determine the time when the election should have been made. Vattel, B. 1, ch. 3, sec. 33. 1 Dall. 58. 2 Dall. 234. 20 Johns. 332. 2 Mass. 179, 236, 244, note. 2 Pickering, 394. 2 Kent's Com. 49.

I am not aware of any case in the American courts where this right of election has been denied, except that of Ainsley *vs.* Martin, 9 Mass. 454. Chief Justice Parsons does there seem to recognise, and apply the doctrine of perpetual alle-

giance, in its fullest extent.   He then declares that a person born in Massachusetts, and who, before the 4th of July 1776, withdrew into the British dominions, and never since returned into the United States, was not an alien, that his allegiance to the king of Great Britain was founded on his birth, within his dominions, and that that allegiance accrued to the commonwealth of Massachusetts, as his lawful successor.   But he adds what may take the present case even out of his rule : " It not being alleged," says he, "that the demandant has been expatriated, by virtue of any statute or any judgment of law."   But the doctrine laid down in this case is certainly not that which prevailed in the supreme judicial court of Massachusetts, both before and since that decision, as will appear by the cases above referred to of Gardner *vs* Ward, and Kilham *vs.* Ward, 2 Mass. and of George Phipps, 2 Pickering, 394, note.

John Inglis, if born before the declaration of independence, must have been very young at that time, and incapable of making an election for himself ; but he must, after such a lapse of time, be taken to have adopted and ratified the choice made for him by his father, and still to retain the character of a British subject, and never to have become an American citizen, if his father was so to be considered.  He was taken from this country by his father before the treaty of peace, and has continued ever since to reside within the British dominions without signifying any dissent to the election made for him ; and this ratification, as to all his rights, must relate back, and have the same effect and operation, as if the election had been made by himself at that time.

How then is his father Charles Inglis to be considered ? Was he an American citizen ?  He was here at the time of the declaration of independence, and prima facie may be deemed to have become thereby an American citizen.  But this prima facie presumption may be rebutted ; otherwise there is no force or meaning in the right of election.   It surely cannot be said, that nothing short of actually removing from the country before the declaration of independence will be received as evidence of the election ; and every act that could be done to signify the choice that had been made,

SUPREME COURT.

except actually withdrawing from the country, was done by Charles Inglis. He resided in the city of New York at the declaration of independence, and remained there until he removed to England, a short time before the evacuation of the city by the British in November 1783; New York during the whole of that time, except from July to September 1776, being in possession, and under the government and control of the British, he taking a part and acting with the British; and was, according to the strong language of the witness, as much a royalist as he himself was, and that no man could be more so. Was Charles Inglis under these circumstances to be considered an American citizen? If being here at the declaration of independence necessarily made him such, under all possible circumstances he was an American citizen. But I apprehend this would be carrying the rule to an extent that never can be sanctioned in a court of justice, and would certainly be going beyond any case as yet decided.

The facts disclosed in this case, then, lead irresistibly to the conclusion that it was the fixed determination of Charles Inglis the father, at the declaration of independence, to adhere to his native allegiance. And John Inglis the son must be deemed to have followed the condition of his father, and the character of a British subject attached to and fastened on him also, which he has never attempted to throw off by any act disaffirming the choice made for him by his father.

The case of M'Ilvaine *vs*. Coxe's Lessee, 4 Cranch, 211, which has been relied upon, will not reach this case. The court in that case recognized fully the right of election, but considered that Mr Coxe had lost that right by remaining in the state of New Jersey, not only after she had declared herself a sovereign state, but after she had passed laws by which she pronounced him to be a member of, and in allegiance to the new government; that by the act of the 4th of October 1776 he became a member of the new society, entitled to the protection of its government. He continued to reside in New Jersey after the passage of this law, and until some time in the year 1777, thereby making his election to become a member of the new government; and the doctrine of allegiance became applicable to his case, which rests on the

[Inglis *vs.* The Trustees of the Sailor's Snug Harbour.]

ground of a mutual compact between the government and the citizen or subject, which it is said cannot be dissolved by either party without the concurrence of the other. It is the tie which binds the governed to their government, in return for the protection which the government affords them. New Jersey, in October 1776, was in a condition to extend that protection, which Coxe tacitly accepted by remaining there. But that was not the situation of the city of New York; it was in the possession of the British. The government of the state of New York did not extend to it in point of fact.

The resolutions of the convention of New York of the 16th of July 1776, have been relied upon as asserting a claim to the allegiance of all persons residing within the state. But it may well be doubted whether these resolutions reached the case of Charles Inglis. The language is, " that all persons abiding within the state of New York, and deriving protection from the laws of the same, owe allegiance to the said laws, and are members of the state." Charles Inglis was not, within the reasonable interpretation of this resolution, abiding in the state and owing protection to the laws of the same. He was within the British lines, and under the protection of the British army, manifesting a full determination to continue a British subject. But if it should be admitted that the state of New York had a right to claim the allegiance of Charles Inglis, and did assert that right by the resolution, referred to, still the case of M'Ilvaine *vs.* Coxe does not apply.

It cannot, I presume, be denied, but that allegiance may be dissolved by the mutual consent of the government and its citizens or subjects. The government may release the governed from their allegiance. This is even the British doctrine in the case of Doe *vs.* Acklam, before referred to. The act of attainder passed by the legislature of the state of New York, by which Charles Inglis is declared to be for ever banished from the state, and adjudged guilty of treason if ever afterwards he should be found there, must be considered a release of his allegiance, if ever he owed any to the state. 1 Greenleaf's Ed. L. N. Y. 26.

From the view of the general question referred to in this court, the answers to the specific inquiries will, in my judgment, be as follows.

1. If the demandant was born before the 4th of July 1776, he was born a British subject; and no subsequent act on his part, or on the part of the state of New York, has occurred to change that character; he of course continued an alien, and disabled from taking the land in question by inheritance.

2. If born after the 4th of July 1776, and before the 15th of September of the same year, when the British took possession of New York, his infancy incapacitated him from making any election for himself, and his election and character followed that of his father, subject to the right of disaffirmance in a reasonable time after the termination of his minority; which never having been done, he remains a British subject, and disabled from inheriting the land in question.

3. If born after the British took possession of New York, and before the evacuation on the 25th of November 1783, he was, under the circumstances stated in the case, born a British subject, under the protection of the British government, and not under that of the state of New York, and of course owing no allegiance to the state of New York. And even if the resolutions of the convention of the 16th of July 1776 should be considered as asserting a rightful claim to the allegiance of the demandant and his father, this claim was revoked by the act of 1779, and would be deemed a release and discharge of such allegiance, on the part of the state, and which having been impliedly assented to, by the demandant, by withdrawing with his father from the state of New York to the British dominions, and remaining there ever since, worked a voluntary dissolution, by the assent of the government and the demandant, of whatever allegiance antecedently existed, and the demandant at the time of the descent cast was an alien, and incapable of taking lands in New York by inheritance.

4. When Charles Inglis, the father, and John Inglis, his son, withdrew from New York to the British dominions, they had the right of electing to become and remain British subjects. And if the grand assize shall find, that in point of

[Inglis vs. The Trustees of the Sailor's Snug Harbour.]

fact they had made such election, then the demandant at the time of the descent cast was an alien, and could not inherit real estate in New York.

III. The next question is, whether the will of Catherine Brewerton was sufficient to pass her right and interest in the premises in question, so as to defeat the demandant in any respect; the premises being at the date of the will, and ever since, held adversely by the tenants in the suit.

Mrs Brewerton was the sister of Robert Richard Randall, and if the devise in his will is void and cannot take effect, she, as one of his heirs at law, would be entitled to a moiety of the lands in question. She died in the year 1815, having shortly before made her last will and testament, duly executed and attested to pass real estate. By this will she devised and bequeathed all her real and personal estate, whatsoever and wheresoever, in law and equity, in possession, reversion, remainder, or expectancy (except some specific legacies) unto her executors, upon certain trusts therein mentioned. If this will was therefore operative, so as to pass her right to her brother's estate, it will defeat the demandant's right to recover, as to one moiety of the premises in question.

The objection taken to the operation of this will is, that the premises were at the date thereof, and ever since have been held adversely by the tenants in the suit.

The validity of this objection must depend upon the construction of the statute of wills in the state of New York. By that statute (1 N. Y. Rev. Laws, 364, sec. 1.) it is declared, that any person having any *estate of inheritance*, either in severalty, in coparcenary, or in common, in any lands, tenements, or hereditaments, may at his own free will and pleasure, give or devise the same, or any of them, or any rent or profit out of the same or out of any part thereof, to any person or persons, (except bodies public and corporate) by his last will and testament, or any other act by him lawfully executed.

This being a question depending upon the construction of a state statute, with respect to the title to real property, it has been the uniform course of this court, to apply the

same rule that we find applied by the state tribunals in like cases. 1 Peters, 371. This statute upon the point now under consideration has received a construction by the supreme court of the state of New York, in the case of Jackson *vs.* Varick, 7 Cowen, 238. The question arose upon the validity of a devise in the will of Medcef Eden, the younger. The objection was, that at the time of the devise, and of the death of the testator, the premises in question were, and had been for several years before in the adverse possession of the defendant, and that he and those under whom he claimed entered originally, without the consent of the devisor or any one from whom he claimed. The court say, the facts present the question whether the owner in fee can devise land, which, at the time of the devise and his death, is in the adverse possession of another. That is, whether a person having a right of entry in fee simple, shall be said to have an estate of inheritance in lands, tenements or hereditaments in the language of our statute of wills.

It is unnecessary to pursue the course of reasoning which conducted the court to the conclusion to which it came. The result of the opinion was, that under the comprehensive words used in the act, a right of entry, as well as an estate in the actual seisin and possession of the devisor, was devisable; and that an estate that would descend to the heir is transmissible equally by will. The judge who delivered the opinion adverted to some cases that had arisen in the same court, wherein a contrary doctrine would seem to have been recognized, but came to the conclusion, that no decision had been made upon the point.

In the case of Wilkes *vs.* Lion, 2 Cowen, 355, decided in the court of errors, in New York, one of the points relied upon by the counsel for the plaintiff in error, was, that this same will of Medcef Eden, the younger, was inoperative as to the premises then in question; they being lands of which he was not seised at the time of his death. I do not find that any direct opinion was given upon this point; but the objection must have been overruled, or the court could not have come to the conclusion it did.

It is said, however, by the demandant's counsel, that these

cases do not apply to the one now before the court; but only such estate as would descend to the heir of the devisor, and that the premises in question here would not descend to the heirs of Mrs Brewerton for want of actual seisin. According to the rule laid down in Watkins on Descents, 23, that where the ancestor takes by purchase, he may be capable of transmitting the property so taken to his own heirs, without any actual possession in himself; but if the ancestor himself takes by descent, it is absolutely necessary, in order to make him the stock or terminus, from whom the descent should now run, and so enable him to transmit such hereditaments to his own heirs, that he acquire an actual seisin of such as are corporeal, or what is equivalent thereto, in such as are incorporeal.

It is very evident, however, that the court could not have intended to apply this rule to the construction of the statute of wills. For they say, in terms, that the question is, whether a person having a right of entry in lands has an estate of inheritance devisable, according to the provisions of the statute. But under the common law rule referred to, a person having only a right of entry, would not be accounted an ancestor from whom the inheritance would be derived. 2 Black. Com. 209. Such a construction would be in a great measure defeating the whole operation of the act.

The demandant in this case states in his count, that upon the death of Robert R. Randall, the right to the land descended to Paul R. Randall and Catherine Brewerton in moieties. So that, by his own showing, she had a right of entry, which, according to the express terms of the decisions in Jackson and Varick, was devisable.

The answer to this question must accordingly be, that the will of Catherine Brewerton was sufficient to pass her right and interest in the premises in question, notwithstanding the adverse possession held by the tenants in this suit, at the date of the will.

IV. The fourth point stated is, whether the proceedings against Paul Richard Randall, as an absent debtor, passed his right or interest in the lands in question to, and vested the

[Inglis *vs.* The Trustees of the Sailor's Snug Harbour.]

.same in, the trustees appointed under the said proceedings, or either of them, so as to defeat the demandant in any respect.

Paul R. Randall, as stated in the case, died some time in the year 1820. He and his sister Mrs Brewerton were the heirs at law to the estate of their brother Robert Richard Randall. If therefore the will of Mrs Brewerton operated to pass her right, Paul R. Randall would be entitled to the other moiety. If her will did not operate, then he would be entitled to the whole of his brother's estate.

It does not appear from the case that any objections were made to the regularity of the proceedings against Paul R. Randall, under the absconding debtor act ; and indeed the question, as stated for the opinion of this court, necessarily implies that no such objection existed. The question is, whether his right in the land passed to, and became vested in the trustees.

As this is the construction of a state law, this court will be governed very much by the decisions of the state tribunals in relation to it. The question is, whether a right of entry passes under the provisions of the absconding debtor act of the state of New York, 1 Rev. Laws, 157. By the first section of the act, the warrant issued to the sheriff commands him to attach, and safely keep, *all the estate, real and personal,* of the debtor. The tenth section authorises the trustees to take into their hands all the estate of the debtor, whether attached as aforesaid or afterwards discovered by them ; and that the said trustees, from their appointment, shall be deemed *vested* with all the estate of such debtor, and shall be capable to sue for and recover the same. And the trustees are required to sell all the estate, real and personal, of the debtor, as shall come to their hands, and execute deeds and bills of sale, which shall be as valid as if made by the debtor himself.

These are the only parts of the act which have a material bearing upon this point. And the first question that would seem to arise is, whether the term *estate,* as here used, will extend to the interest which the debtor has in lands held adversely. An estate in lands, tenements, and hereditaments, signifies such interest as a person has therein, and is the con-

dition or circumstance in which the owner stands with regard to his property. Coke. sec. 345. a.. 2 Black. Com. 103.

The language of the act is broad enough to include a right of entry; and there can be no reason to believe that such was not the intention of the legislature.

The doctrine of the court of common pleas in England, in the case of Smith *vs.* Coffin, 2 H. Black. 461, has a strong bearing upon this question. The language of this absconding debtor act, with respect to the estate of the debtor to which it shall extend, is as broad as that of the English bankrupt laws, and the same policy is involved in the construction. In the case referred to, the court say, the plain spirit of the bankrupt law is, that every beneficial interest which the bankrupt has, shall be disposed of for the benefit of his creditors. On general principles, rights of action are not assignable, but that is a rule founded on the policy of the common law, which is averse to encouraging litigation. But the policy of the bankrupt law requires that the right of action should be assignable, and transferred to assignees, as much as any other species of property. Its policy is, that every right, belonging in any shape to the bankrupt, should pass to the assignees.

The estate of the debtor, under the New York statute, becomes vested in the trustees, by the mere act and operation of law, without any assignment.

The courts in New York have given a literal construction to this act, whenever it has come under consideration, so as to reach all the property of the absconding debtor. In the matter of Smith, an absconding debtor, 16 Johns. 107, the broad rule is laid down that an attachment under this act is analogous to an execution. And in the case of Handy *vs.* Dobbin, 12 Johns. 220, when the proceeding was under another statute, 1 Rev. Laws, 398, very analogous to the one under consideration, the court say, there can be no doubt that the constable, under the attachment, could take any goods and chattels which could be levied on by execution. The authority in both cases is the same. And in Jackson *vs.* Varick, 7 Cowen, 244, it is laid down as a rule admitting of no doubt, that a right of entry may be taken and sold under an execution.

It is said, however, that this right of entry does not pass, because, by the tenth section of the act, it is declared, that the deeds given by the trustees shall be as valid as if made by the debtor, and that the debtor could not make a valid deed of lands held at the time adversely.

This objection does not apply to the case : the question does not arise upon the operation of a deed given by the trustees. The point is, whether the trustees themselves had any interest in these lands : not whether they would give a valid deed for them, before reducing the right to possession. If it should be admitted that they could not, it would not affect the present question. The right is vested in the trustees by operation of law, the act declaring *that the estate shall be deemed vested in them on their appointment*, and that they shall be capable to sue for and recover the same ; implying thereby that a suit may be necessary to reduce the estate of possession.

Again, it is said, that after such a lapse of time, it is to be presumed that all the debts of Paul R. Randall have been paid, and the trust of course satisfied ; and that the estate thereupon became revested in Paul R. Randall.

This objection admits of several answers. It does not appear properly to arise under the point stated. But the question intended to be put would seem to be, whether the right, being a mere right of entry, passed, and became vested in the trustees. If it did so vest, it could not be revested, except by a reconveyance, or by operation of law, resulting from a performance of the trust, by paying off all the debts of the absent debtor. And whether these debts have been satisfied, is a proper subject of inquiry for the grand assize. There is not enough before this court to enable it to decide that point. It is a question of fact, and not of law. If it was admitted that all the debts have been satisfied, the effect of such satisfaction would be a question of law. The evidence might probably warrant the grand assize in presuming payment ; but even that may not be perfectly clear. The order of the court upon the trustees to pay to the agent or attorney of Paul R. Randall five thousand five hundred dollars, out of the money remaining in their hands, does not

purport to consider this sum as the surplus after payment of all the debts. It was to be paid out of the moneys remaining in the hands of the trustees, thereby fully implying, that their trust was not closed. And if the fact of payment and satisfaction of the debts is left at all doubtful, this court cannot say, as matter of law, that the interest in the land became revested in Paul R. Randall. It must depend upon the finding of the grand assize.

It is objected, however, that the defence set up, and embraced in the two last questions, is inadmissible. That in a writ of right, the tenant cannot, under the mise joined, set up title out of himself, and in a third person. That it is a question of mere right between the demandant and the tenant. And it has been supposed, that this is the doctrine of this court in the case of Green vs. Liter, 8 Cranch, 229. If any thing that fell from the court in that case will give countenance to such a doctrine, it is done away by the explanation given by the court in Green vs. Watkins, 7 Wheat. 31; and it is there laid down, that the tenant may give in evidence the title of a third person, for the purpose of disproving the demandant's seisin. That a writ of right does bring into controversy the mere right of the parties to the suit, and if so, it, by consequence, authorises either party to establish by evidence, that the other has no right whatever in the demanded premises; or that his mere right is inferior to that set up against him. And this is the rule recognized in the supreme court of New York. In the case of Ten Eyck vs. Waterberry, 7 Cowen, 52, the court say, that in a writ of right, the mise puts the seisin in issue, as the plea of not guilty in ejectment puts in issue the title, and that under the mise any thing may be given in evidence, except collateral warranty. The same rule is laid down by the supreme judicial court of Massachusetts, in the case of Poor vs. Robinson, 10 Mass. Rep. 131; and such appears to be the well settled rule in the English courts. Booth, 98, 115, 112. 3 Wilson, 420. 2 W. Black. Rep. 292. 2 Saund. 45 f. note 4. Stearns on Real Actions, 227, 228, 372.

The answer to this question will accordingly be in the affirmative, unless the grand assize shall find that the trusts have been fully performed; and if so, the interest in the land

will by operation of law become revested in Paul R. Randall.

V. Another point submitted to this court is, whether, inasmuch as the count in the cause is for the entire right in the premises, the demandant can recover a less quantity than the entirety.

This is rather matter of form, without involving materially the merits of the case. And as the action itself has become almost obsolete, it cannot be very important how the point is settled. I have not therefore pursued the question to see how it would stand upon British authority. The leaning of the courts in that country is against the action, and against even allowing almost any amendments, holding parties to the most strict and rigid rules of pleading; and it may be that the English courts would consider, that the recovery must be according to the count. But whatever the rule may be there, I think it is in a great measure a matter of practice, and that we are at liberty to adopt our rule on this subject. And no prejudice can arise to the tenant by allowing the demandant to have judgment for and recover according to the right which, upon the trial, he shall establish in the demanded premises. The cases referred to, showing that a demandant may abridge his plaint, do not apply to a writ of right. This is confined to the action of assize, and authorised by statute 21 Hen. 8, ch. 3. This statute has been adopted in New York, 1 Rev. Laws, 88, but does not help the case. But independent of any statutory provision, I see no good reason why the demandant should not be allowed to recover according to the interest proved, if less than that which he has demanded.

It is the settled practice in the supreme judicial court in Massachusetts, in a writ of entry, to allow the demandant to recover an undivided part of the demanded premises. The technical objection, that the verdict and judgment do not agree with the count, is deemed unimportant; the title being the same as to duration and quality, and differing only in the degree of interest between a sole tenancy and a tenancy in common. The tenant cannot be prejudiced by allowing this. He is presumed to know his own title, and might have dis-

[Inglis vs. The Trustees of the Sailor's Snug Harbour.]

claimed. The courts in that state consider, that with respect to the right to renew a part of the land claimed, there is no distinction between a writ of entry and an action of eject-ment. 2 Pick. 387. 3 Pick. 52. Nor is it perceived that any well founded distinction, in this respect, can be made. be-tween the action of ejectment and a writ of right.

The opinion of the court upon this point is, that under a count for the entire right, a demandant may recover a less quantity than the entirety.

Mr Justice JOHNSON.

I concur in the opinion in favour of this devise; but this is one of those cases in which I wish my opinion to appear in my own words.

This case comes up on a certified difference of opinion on five points. I take them in their order on the record, not that in which they were argued. The first, which is a tech-nical question, and of minor importance, I shall pass over.

The second, which depends upon the civil or political re-lation in which the demandant Inglis stands to the state of New York, has been exhibited under four aspects. The first contemplating him as born in the city of New York before the the 4th of July 1776. The second, as born after that period, but before the British obtained possession of the place of his birth. The third, as born in New York while a British garrison. The fourth, as born an American citizen, before the treaty of peace, but having elected to adhere to his allegiance to Great Britain. In the argument there was a fifth aspect of the question presented, which depended up-on the act of confiscation and banishment by the state against the father of the demandant. On the subject of descent, in Shanks's case, which having been argued first in order, I had prepared first to examine; I have had occasion to remark, that the right being claimed under the laws of the particular state in which the land lies, the doctrines of allegiance, as applicable to the demandant, must be looked for in the law of the state that has jurisdiction of the soil.

In this respect the laws of New York vary in nothing mate-rial from those of South Carolina. By the twenty-fifth arti-

cle of the constitution of New York of 1777, the common
law of England is adopted into the jurisprudence of the state.
By the principles of that law, the demandant owed allegi-
ance to the king of Great Britain, as of his province of New
York. By the revolution that allegiance was transferred to
the state, and the common law declares that the individual
cannot put off his allegiance by any act of his own. There
was no legislative act passed to modify the common law in that
respect; and as to the effect of the act of confiscation and
banishment, the constitution of the state has in it two provi-
sions which effectually protect the demandant against any
defence that can be set up under the effect of that act. The
thirteenth article declares that " no member of the state shall
be disfranchised or deprived of any of the rights or privileges
secured to the subjects of the state by that constitution, un-
less by the laws of the land or the judgment of his peers."
And the forty-first declares, " that no act of attainder shall
be passed by the legislature of the state for crimes other than
those committed before the termination of the present war,
*and that such acts* (which I construe to mean acts of attain-
der generally) *shall not work a corruption of blood.*"

I shall therefore answer the second question in the affirma-
tive; that is, that he was entitled to inherit as a citizen, born
of the state of New York.

On the third question, there were two points made. 1.
That Mrs Brewerton having never entered, could not devise.
2. That the issue being joined upon the mere right, it was
not competent for the tenant to introduce testimony to prove
the interest out of the demandant, unless (I presume it was
meant) the right be proved to be in the tenant. On the
first of these points I am satisfied, that the state of New
York has not suffered the exercise of the testamentary power
to be embarrassed with the subtleties of the English law re-
specting entries and adverse possessions. The words of their
statute of wills are broad enough to carry any right or inte-
rest in lands, and such practically seems to have been the
uniform understanding in that state.

On the second point, under this question, the facts seem
to furnish a very obvious answer. Whatever be the rule in

other cases, and I do not feel myself called upon to say what the rule is, it certainly can have no application here, since it is *through* Mrs Brewerton that the demandant has to trace his title. Certainly then it must be a good defence, if the tenant can establish that it could not pass through Mrs Brewerton, if she had prevented its descending by an act of her own, valid to that purpose. That question also I should answer in the affirmative.

On the fourth question, I feel it difficult to give a precise answer. An attachment, and conveyance under it, are equivalent to an execution executed. But then there is reason to believe, that the situation in which we find this attachment is analogous to that of an execution, satisfied without the sale of this particular property levied upon. Then could such an execution interfere with the rights of the heir?

It does not appear to me that this question can be answered until the fact of satisfaction can be affirmed or repelled. It is for or against the demandant, according to that alternative.

The fifth is the material question, and since it has been acknowledged in argument, that this suit was instituted on the authority of the case of the Baptist Association, it is necessary first to determine the doctrine which that case establishes.

The devise there was of lands lying in Virginia; the intended devisee was an unincorporated society, described in the will as meeting at Philadelphia; that society became incorporate under a law of Pennsylvania, not of Virginia, and then brought suit in equity in Virginia, to recover the property devised.

At the hearing, the court decided upon the single question, "whether the plaintiffs were capable of taking under that will," and accordingly this court certify an opinion to no other point. Its language is, " that the plaintiffs are incapable of taking the legacy for which this suit was instituted." And, notwithstanding the marginal notes of the reporter to the contrary, that I consider as the only point decided in the cause. What the law of the case would have been, had the attorney general of Virginia been made a party to the

suit, and (I presume also as a necessary inference,) had the society been incorporated by Virginia, in order to enable them to take the legacy, this court expressly declines deciding (p. 50); and certainly it would have been deciding between parties not before it, had it undertaken in that suit to pass upon the interest in, or power over the subject existing in the state of Virginia.   The statute of 43 Eliz. had been expressly repealed in Virginia, previous to the death of Hart, the testator; and although the learned judge who delivered the opinion of the court, goes so much at large into the origin, construction and effect of that statute, it could only have been to prove all that the case required to have established, to wit, that it is under that statute alone that, even in England, a court of equity could extend to the complainants the relief which they craved.   That statute being repealed in Virginia, it followed that the equity powers of the state courts, and of consequence that of the circuit court of the United States, could no longer be exercised over the subject of the charities embraced in that statute; that the state of Virginia, where the land lay, and not the state of Pennsylvania, stood in the relation of parens patriæ, and therefore, that those powers and those rights which the crown exercises over charities in England, in order to sustain and give effect to them, could only be exercised in that case by Virginia.

So far I consider the decision as authority, and so far it would require more than ordinary ingenuity to excite a reasonable doubt of its correctness.   I consider it as too plain to be questioned, that the powers which the *court of chancery* in Great Britain exercises over bequests of charities, in cases where the interest cannot vest under the rigid rules of law, as applied to other bequests, is vested in that court by, or rather usurped under the statute of Elizabeth.   I am not now speaking, it must be noted, of the power of *the crown* in such cases, but of the portion of the prerogative power over charities now exercised by the court of chancery in that kingdom.

I consider it as conclusive to prove the peculiar origin of this power, that there lies no appeal from the decision of the

chancellor in charity cases.   Cro. Cha. 40, 351.   4 Viner's Abridg. 496.   And when cases occur not enumerated in the statute of Elizabeth, or not strictly analogous thereto, the crown still exercises the power of disposing of them by sign manual.   See the cases collected in Viner, Charit. Uses, G. 3, and note; also, 7 Ves. 490.   So that were the statute of Elizabeth repealed in England to-morrow, I see not by what authority this power could be exercised even there in the chancery courts.   The history of this branch of the chancellor's jurisdiction proves that it could not be.

The plain object of the act of 43 Eliz. is to place in commission a troublesome branch of the royal prerogative, and to vest the commissioners with power to institute inquests of office, or by other means to discover charities, or the abuse or misapplication of charities, and to authorise the board to exercise the same reach of discretion over such charities as the crown possessed; subject, however, to a revising and controlling power in the lord chancellor; not a mere judicial power, but a ministerial legislation and absolute power; a power, however, secondary or appellative in its nature, not original.   This controlling power being absolute and final, soon swallowed up its parent, and became original and absolute.   One judge admitted the precedent of an original bill in a charity case, a second judge satisfied his scruples upon that precedent, and other judges following, regarded it as a settled practice.   But in whatever way the power is exercised, whether as original or appellate, no other authority for its exercise has ever been claimed by the chancellor but the 43d Elizabeth.

The correctness of the decision of this court therefore in the Baptist Association case cannot, I think, be disputed.   And yet it does in no wise affect the case now before us.   But, it is argued that, if the statute 43 Elizabeth be in force in New York, and its courts can exercise an original power under it, or if they can pursue the intermediate steps necessary to the exercise of an appellate or revising power, (six in number, I think, lord Coke makes them, 2 Inst.) still it can only be a suit in chancery, in the name of the people, or of their attorney general, or of the corporation constituted

by them, although vested with all their interest in, or power over the subject.

To me it appears demonstrable, that the 43 Elizabeth introduces no new law of charities, makes none valid not valid before it passed, but simply places the right and power of the court over charities in other hands. If this were not the case, why should bequests to the universities and great schools, bequests in all cases constituting private visitors, and bequests to towns corporate, (section 2 and 3) hospitals, &c. be excepted from its operation? Why should a more liberal rule be introduced with regard to the enumerated indefinite charities and the excepted cases remain subject to a more rigid system? Certainly the enumerated exceptions in that statute can lose nothing in point of merit or claim to public protection and indulgence, by comparison with those acted upon by the statute. Indeed, the preamble explicitly confines the views of the legislature to enforcing the application of the charities according to the charitable interest of the donor; it is the organization of a machine for carrying that interest into effect, without introducing any new rule of law on the subject of construing, applying, or effectuating that intention.

What then was the law of that day, of the time when the 43 Elizabeth was passed, on the subject of charitable donations? It was a system peculiar to the subject, and governed by rules which were applicable to no other; a system borrowed from the civil law, almost copied verbatim into the common law writers. This will distinctly appear by comparing Domat with Godolphin, in the Orphan's Legacy.

It has been said that there are neither adjudged cases nor dicta of elementary writers on the subject of the law as it stood previous to the 43 Elizabeth; but this I think is not quite correct. In Swinburn on Wills, as well as Godolphin's Orphan's Legacy, both books of great antiquity and of high authority, we find all the rules for construing, enforcing and effectuating charities which have been maintained and acted upon in the chancery since the 43 Elizabeth, laid down as the existing laws of charitable devises; and yet the statute of Elizabeth is not quoted by either as the authority

for their doctrines; but their margins are filled with quotations from books which treat of the civil and common law. God. Orph. Leg. Sec. Ed. 1676, P. 1, ch. 5, sec. 4, p. 17. Swinb. on Wills, P. 1, sect. 16. And in so modern a book as Maddock's Cha. Vol. I. 47, we find the law laid down in these words: " it has been an uniform rule in equity, *before* as well as after the statute of 43 Elizabeth, ch. 4, that where uses are charitable, and the person has in himself full power to convey, the court will aid a defective conveyance to such uses; and then goes on to enumerate all that variety of cases to which the English courts have applied the latitudinous principle, that the statute of charitable uses supplies all the defects of an assurance which the donor was capable of making, even to a devise by a lunatic.

Nor are these authors without adjudications to sustain the position, that the law was such *before* as well as after the statute 43 Eliz. Rolt's Case in Moore, p. 855, was the case of a will which occurred long before the statute of Eliz. passed. The devise was of land not in use, and not devisable by law or custom; so that had it been to an individual, it had been clearly void. Accordingly, the heir at law entered; yet, after the statute of Elizabeth, it was hunted up and returned upon inquest, under the statute; and the lord chancellor on an appeal, having called in the aid of the *two common law chief justices,* they all held it a good limitation or appointment. Now there never has been a time when a subsequent statute, general in its provisions, as was that of charitable uses, could divest a right legally descended upon an heir at law. It follows, that the devise must have been good without the aid of that statute; this decision took place in court twenty years after the date of the statute.

So also in Revett's Case in the same book, p. 890, when, the will was made and the death of the devisor took place in 1586, about seven years before the statute of 43 Elizabeth, and there had been no surrender, the land being copyhold, so that the devise to the charity was clearly void if made to an individual, and accordingly the younger son entered; the charity was enforced against a purchaser from the heirs,

under the idea that it was good as an appointment; clearly in pursuance of the rule, that wherever the donor has power to convey, and manifestly intends to convey, the law will make good every deficiency in favour of charities.

And in the case of sir Thomas Middleton, which also happened before the statute, and where the legal defect lay in the legal insufficiency of the party in interest, and which was not a case of devise, yet it was held good.

It is true Perkins gives an instance of a very early date (40 Edw. 3; see Perkins, sec. 510), of a devise to a society not incorporated with power to purchase, in which the devise was held void; but on that case it may be remarked, that as the clergy had an exclusive possession of the court of chancery for many years after, (to 26 Henry 8), it is easy to perceive how the law of charities came to be improved to what it appears to have been at the date of the cases quoted from Moore. And there are two other remarks applicable to the cases in Perkins. In a modified sense those devises are held to be void even at this day, and to need the aid of a royal prerogative still existing in the court, to relieve the devisees against the rules of the common law. It is obvious that property, devised to charities under such circumstances as prevent its vesting by the rules of the common law, is placed in a situation analogous to that of escheat, and afterwards disposed of under the king's sign-manual, according to his conscience, actual or constitutional; so that in a trial at *common law,* such devise would be held void, unless aided by prerogative power.

And secondly, there is this difference between the case in Perkins and the present case, that the former is expressed in words which contemplate vesting presently; the latter, in words which contemplate a future vesting : which I consider an all important feature in the present case, and one which may give validity to the present devise, without resorting to the aid of those principles which appear peculiar to charitable bequests.

But as a charity, to be governed by the law of the state of New York, it appears to me almost idle to view this case with

reference to any other rule of decision than their own adju-
dications. The case of the Trustees of New Rochelle, 8
Johns. Ch. Rep. p. 292, was a case of greater difficulties
than the present; for there the devise is immediate in pre-
senti, to a devisee having no capacity to take at the time.
The legislature afterwards gave that capacity, and the court
held the devise valid; nor is it unimportant in that case to
observe, that the case in Ambler, 422, of the devise to " the
poor inhabitants of St Leonard's Shore-Ditch," is recognised
as authority; as well as that of the Attorney General *vs.*
Clarke, in the same book, 651.

Now this decision seems full to these points: 1. That the
legislature of that state can, *ex post facto,* give a capacity
to take a charity, where there was no such capacity existing
at the time of devise over, is a case where the future exist-
ence of that capacity was not contemplated by the testator.
2. That an act of incorporation, with capacity to take, dis-
penses with the presence of the representative of the state,
in a suit to recover such a charity.

What more can be required in the present case, especially
where the devisee is the party demandant.

It is no objection to the authority or the New Rochelle
case, that it was a suit in equity; for in a case like the pre-
sent, where nothing is wanting but a competent party to sue
or be sued, whenever that party comes in esse, there can be
no reason why the suit should not be at law, if courts of law
are competent to give relief. Had the devise been void in
the case referred to, the estate must have vested in the legal
representative, and could no more have been shaken in
equity than at law.

But I have said, that the defendant here might dispense
with the aid of the peculiar principles of the law of charities;
and my opinion distinctly is, that the devise is good upon
general principles, in every respect, unless it be in the time
of vesting; then it is not restricted within the legal limits,
since the legislature may, by possibility, never constitute the
corporation contemplated in the will.

It is in general true, that where there is a present imme-
diate devise, there must exist a competent devisee, and a

present capacity to take. But it is equally true, that if there exists the least circumstance from which to collect the testator's contemplation or intention of any thing else than an immediate devise to take effect in presenti, then, if confined within the legal limits, it is good as an executory devise.

This is the case of a devise to an infant in ventre sa mere; and this the ground of the distinction in Hobart 33, of a present devise to a corporation where it is or is not in progress towards positive existence.

Now the present case is one clearly of an alternative devise to such and such official characters, if by virtue of that devise they can take in perpetuity and succession; and if not, then to them when constituted a body politic by positive statute. Here is clearly contemplated a future vesting, to depend on a capacity to take, to be created by a legislative act; and if the passing of that legislative act had been restricted by the will, in point of time, to the lives of the individuals filling those offices at the time of the death of the testator, on what possible ground could the devise have been impeached?

Does then the law invalidate the devise for want of such restriction, or some other equivalent to it? It is perfectly clear that the law of England does not, and never did, as relates to charities; at least where there has been no previous disposition. In this respect it seems to constitute an exception to the law of executory devises; as is implied in the general reference to the prerogative of the crown to give it legal efficiency, by his sign manual, and as is distinctly recognised in the case of the Trustees of New Rochelle, in the courts of New York; a case in which the plaintiffs might as well have waited for ever upon the legislative will, as in the present case.

There may be a reason for this distinction, since it depends upon the sovereign will to prevent the perpetuity at once; and the presumption is, that the legislature will not delay to do that which it ought to do. And whence at last arises this rule against perpetuities? It is altogether an act of judicial legislation, operating as a proviso to the statute of wills; a restriction upon the testamentary power. The

authority from which the exception emanated could certainly limit it so as to prevent its extension to an object under the care of the sovereign power.

Upon the whole, I am of opinion that the act of incorporation was at least equivalent to the king's sign manual, and vested a good legal estate in the tenant. That although in the interval it should have descended upon the heir, it descended subject to be divested and passed over by that exercise of prerogative power. But I perceive no necessity for admitting that it ever descended upon the heir; since the right of succession seems rather to be in the commonwealth in the case of charities, as parens patriæ.

Mr Justice STORY.

This cause was argued with great ability and learning at the last term of this court, and has been held under advisement until this time. In the interval, I have prepared an opinion upon all the points argued by counsel; and upon one of those points of leading importance, I have now the misfortune to differ from a majority of my brethren. Upon another leading point, that of the alienage of the demandant, my opinion coincides generally with that of the majority of the court; but the reasons, on which it is founded, are given more at large than in that now delivered by my brother Thompson. Under these circumstances, I propose to deliver my opinion at large upon all the points argued in the cause, mainly in the order in which they were discussed by the counsel. It is not without reluctance that I deviate from my usual practice of submitting in silence to the decisions of my brethren, when I dissent from them; and I trust, that the deep interest of the questions, and the novelty of the aspect under which some of them are presented, will furnish an apology for my occupying so much time.

The first point is, whether the devise in the will of Robert R. Randall of the lands in question, is a valid devise, so as to divest the heir at law of his legal estate, or to affect the lands in his hands with a trust.

In considering this question, it appears to me that this court is to look into the terms of the will, and to construe

VOL. III.—T

it according to the intention of the testator. That intention has been justly said to constitute the pole star to guide courts in the exposition of wills. When the intention is once fairly ascertained, it is wholly immaterial that it cannot be carried into effect by the principles of law; for our duty is to interpret, and not to make wills for testators.

In looking at the terms of the present devise, it appears to me clear, that the testator's intention was to vest in certain persons, in their official, and not in their private capacity, all the residue of his estate for a certain charity stated in the devise. The language is, " I give and bequeath the same unto the chancellor of the state of New York, the mayor and recorder of the city of New York, the president of the chamber of commerce," &c. &c. Did he by these terms mean to devise to the individuals who then occupied these offices, the estate in question, or to the persons who might hold them at the time of his death, or to the persons who might successively from time to time hold them? It was certainly competent for him to devise to them personally, and in their private capacity, by their official description. If a testator were by his will to give an estate to the bishop of New York for life, or to him and his heirs, without giving him his christian or surname, there is no doubt that the devise might well take effect, as a devise to the then incumbent in office, as a descriptio personæ. The law does not require, to make a devise or legacy valid, that the party should be designated by his name of baptism or surname. It is sufficient if he be pointed out by any description, leaving no room for doubt as to the identity and certainty of the person. A devise to the eldest son of A. is just as good as if his name were given. A devise to the present president of the United States could be just as good as if his name were written at large in the will. The maxim of law is, that the designation must be certain as to the person to take; and id certum est, quod certum reddi potest. There is no doubt, then, that the chancellor, mayor and recorder, &c. &c. of New York might take as individuals, if such were the intention of the testator. I go farther and say, that if the testator did intend the present devise to them in their

private characters, they would take not merely an estate for life in the premises, but an estate in fee.    My reason is, that the scope and objects of the charity, being perpetual, require that construction of the will to carry into effect the intention of the testator(*a*).

But the difficulty is in arriving at the conclusion upon the terms of the will, that the testator did mean any devise to them in their private capacities.    It is manifest from his language, that he did not devise to the then chancellor, mayor and recorder, &c. &c. in their private capacities, because his language is, that it is to the chancellor, &c. &c. "*for the time being, and their respective successors in the said offices for ever.*"    It is then a devise to them, as officers, during their continuance in office, and the estate is to go to their successors in office *for ever*; so that none of the devisees are to take any certain estate to themselves, but only while they continue in office.    It is said that the court may reject the latter words, if inconsistent with the avowed intention and objects of the will.    If the other language of the will required an interpretation of these words different from the ordinary meaning, there might be good ground for such an argument; but that the devise will, in point of law, become ineffectual if they are not rejected, furnishes no ground for the court to exclude them.    Words which are sensible in the place where they occur, and express the testator's intention, are not to be rejected because the law will not carry into effect that intention.    If it were otherwise, courts of law would make wills, and not construe them.    But what ground is there to say, that the words " for the time being," and " their successors in office" ought to be rejected?    The former clearly designate what chancellor, mayor and recorder, &c. &c. are meant.    How then can the court take one part and reject the other part of the description?    How can the court say that the testator meant the then incumbents in office, when he has spoken of them as the incumbents for the time being?    His intention clearly is that the charity shall be a perpetuity.    He devises to the successors in

(*a*) Cruise's Digest. Devise, cha. 11, sect. 72.

office *for ever*. They are to be the administrators of the charity for ever. Upon what ground can the court exclude the successors from the administration of the charity, when the testator has so designated them? Why may we not equally well exclude the present incumbents, as the future? Both are named in the will; both are equally within the view of the testator of equal regard. Suppose all the other incumbents had died, or had been removed from office, is there a word in the will that shows that they or their heirs could still act as trustees, when they ceased to possess office, in exclusion of the actual incumbents? If not, how can the court say that it will defeat the main intention as to the administrators, and yet fulfil the charity as the testator designed it should be executed?

But this exposition does not rest on a single clause of the will. It pervades it in all the important clauses. In another clause of the will the testator directs that the trustees shall administer the charity "in such manner as the said trustees or a majority of them may from time to time, or *their successors in office may from time to time direct*." And again, the testator adds, "it is my intention that the institution hereby directed and created should be *perpetual; and that the above mentioned officers for the time being, and their successors* should for ever continue and be the governors thereof, and have the superintendence of the same." Here is a most deliberate re-statement of his intention and objects. The governors and administrators of his charity are not to be the then incumbents in office, but the officers for the time being; not the individuals when out of office, but *their successors* in office. What right then can this court have to say that the successors in office shall not be governors? Would it not be a plain departure from the express intention and solemn declarations of the will? The testator seems to have been apprehensive, that after all there might be some impediment in carrying his intention into effect. What then does he provide? That his intention shall be disregarded? That provisions of his will, as to *successors*, &c. &c. shall be disregarded or rejected? No, so far from it, that he goes on to provide for the emergency, so as to

give full effect to his intention. His words are, " that it is my will and desire, that if it cannot be legally done, according to my above intention, by them (the trustees) without an act of the legislature, it is my will and desire that they will as soon as possible apply for an act of the legislature to incorporate them for the purposes above specified." So that the successors in the manner above mentioned constituted a primary, as well as a perpetual object of the devise. It seems to me so plain and clear upon the language of the will, that the testator never abandoned the intention of having the trustees take in their official and not in their private capacity, that with great deference to the judgment of others, I am unable to perceive any ground on which to rest a different opinion.

If this is so, then it is next to be considered whether such devise is void at law. I am spared the necessity of going at large into that question, by the decision of this court in the case of the Trustees of the Philadelphia Baptist Association *vs.* Hart's Executors, 4 Wheat. Rep. 1, where the subject was very amply discussed ; and for reasons, in my judgment unanswerable, it was there decided that such a devise was void at law. Upon that occasion I had prepared a separate opinion; but that of the chief justice was so satisfactory to me, that I did not deem it necessary to deliver my own.

If the devise was void at law at the time when it was to have effect, viz. at the death of the testator, the subsequent act of the legislature of New York could not have any effect to divest the vested legal title of the heirs of the testator. The devise was not a devise to a corporation not in esse, and to be created in futuro. It was a devise in presenti, to persons who should be officers at the death of the testator, and to their successors in office. The vesting of the devise was not to be postponed to a future time, until a corporation could be created. It was to take immediate effect ; and if the trustees could not exercise their powers in the manner prescribed by the testator, they were to apply to the legislature for an act of incorporation. Assuming, then, that a devise per verba de futuro, to a corporation not in esse, which

is to take effect when the corporation should be created,
would be good, and vest, by way of executory devise, in
the corporation when created, as seems to have been lord
chief justice Wilmot's opinion (Wilmot's Opinion, p. 15); it
is a sufficient answer that such is not the present case. From
the other report of the same case, Attorney General *vs*.
Downing, Amb. 550, 571, and Attorney General *vs*. Bow-
yer, 3 Ves. 714, 727, I should deduce the conclusion, that
the case turned upon the peculiar doctrines of the court of
chancery in respect to charities; and that Lord Camden's
opinion was founded on that. His judgment is not, as far
as I know, in print; and whether he thought that *at law* a
devise in futuro to an executory corporation would be good,
does not appear. In the case before him he acted upon it
as a charitable *trust*, not as a devise of the legal estate(*a*).

But it is said, that there are cases in which it has been
held, that a devise to persons in their official capacity is
good to the party in his natural capacity; and that it is not
true, that, because the devisees cannot take in succession,
they cannot take at all: a case from Brook's Abridgement, ti-
tle Corporation, pl. 34, is relied on. There the principal
point was of a different nature: whether a corporation com-
posed of a master and fraternity, could present the master to
a benefice. And Pollard, J. on that occasion said, " if J. S.
is dean of P. I may give land to him by the name of dean,
&c. and *his successors*, and to J. S. and his *heirs*, and there
he shall take as dean, and also as a private man; and he is
*tenant in common with himself*." Now, the plain meaning
of this is, that because he took one moiety in his official ca-
pacity to him and his successors, that did not disable him to
take the other moiety to him and his *heirs*, but he held the
latter in his private capacity. Another case is from Co. Litt.
46, b. where it is said, if a lease for years be made to a
bishop and his successors, yet his executors and administra-
tors shall have it in *autre droit*; for regularly no chattel can
go in succession in case of a *sole* corporation, no more than

(*a*) See also, 1 Roll. Ab. Devise, H. sec. 1. Com. Dig. Devise, K.

if a lease be made to a man and his heirs, it can go to his heirs(*a*). Now, in the case of a sole corporation, it is manifest that the intention is to give the chattel to the actual incumbent in office, for his life, and he is entitled to hold it beneficially. But no chattel can pass in succession; and then the question arises, whether the court will declare the gift void, as to the residue of the term, or consider the gift absolute. The construction adopted has been to consider the intent to be executed *cy pres;* and, as the testator intended to give the whole, to vest the term absolutely in the bishop, and then by operation of law it would go to his assigns. But this is a case of a *sole* corporation, where the party is capable to take in his corporate, as well as in his natural capacity for life. The present is a case of aggregate persons, not capable of taking in a corporate capacity. To give the estate to them in their natural capacity, and for life only, would defeat the testator's intention; for he meant a perpetuity of trust, and to persons in office, however often the incumbents might change: to give them, in their natural capacities, an estate for life when not officers, would defeat the primary object which he had in view. He meant no beneficial interest to any incumbent, but a charitable trust to a succession of official trustees(*b*).

It is also said, that in a will a particular may be made to yield to a more general intent. Certainly it may; but then the difficulty in the application of this rule to the present case is, that the argument insists upon a construction which I cannot but deem an overthrow of the general, to subserve an intent not indicated. Because the testator has expressed an intent to be carried into effect one way, which cannot consistently by law be so; and the court can see another way, by which he might have carried it into effect, if he had thought of it; it does not follow that the court can do that which the testator might have done, and new model the provisions of the will. If a testator should per verba de *presenti* devise an estate to a corporation not in esse,

(*a*) See Co. Lit. 9, a.

(*a*) See 2 Preston on Estates, 5, 6, 7, 46, 47, 48. Com. Dig. Estates. a. 2.

and he knew the fact, or mistook the law, the court could not construe the words as de *futuro*, and declare it a good devise to a corporation to be created in futuro. The case in 1 Roll. Abridg. Devise, H. 1. 50, is decisive of that. The general intention here appears to me to be to create a perpetual trust in certain trustees in succession, for charity; and I can perceive no particular intent, as distinguishable from that general intent. The perpetuity, the succession and the trusteeship, are in his view equally substantial ingredients. So far from allowing any other than the official trustees to administer it, he even points out that if the trust cannot be executed by them, the estate, if it descends to his heirs, shall descend clothed with a trust. And he even appoints the same trustees and *their successors in office* executors of his will.

I come now to the other part of the question, whether, if the devise be void at law, the estate in the hands of the heirs is affected with the trust in favour of the charity. It appears to me most manifest, that it is affected by the trust, if we consult either the intention of the testator or the express terms of the will. The closing paragraph of the will is, in my view of it, decisive, as creating an express trust in the heirs. " It is," says the testator, " my desire, all courts of law and equity will so construe this my said will, as *to have the estate appropriated to the above uses*; and that the same should in no case, for want of form or otherwise, be construed as that my relations, or any other persons, should heir, possess, or enjoy my property, *except in the manner and for the uses herein above specified.*"

If no trustees had been named in the will to execute the charity, it seems to me very clear that these terms would have created a trust in the heirs. There cannot, as I think, be a doubt, that independent of the statute of mortmain, 9 Geo. 2, ch. 26, the present devise would be held a good charitable devise, and would be enforced in equity, at least since the statute of 43d of Elizabeth of charitable uses. The case of White *vs.* White; of Attorney General *vs.* Downing, Amb. Rep. 550, 571; of Attorney General *vs.* Tancred, Amb. 351, S. C. 1 Eden's Rep. 10; and of Attorney Gene-

ral *vs.* Bowyer, 3 Ves. 714, 717, would alone be decisive; but there are many others to the same effect(*a*). Whether the statute of 43 Elizabeth is in force in the state of New York, or whether, independent of any enactment, a court of equity could enforce this as a charitable trust in the exercise of its general jurisdiction, or as the delegate, for this purpose, of the parental prerogative of the state; or whether such court could hold it utterly void; it is unnecessary for us to consider; that point may well enough be left to the decision of the proper state tribunal, when the case shall come before it. At present I do not think it necessary to say more, than that if the trust be utterly void, then the heirs would by operation of law take the legal estate stripped of the trust. If the trust be good, then it is knit to the estate, and the heirs take it subject to the trust.

But it is said, that if the trust be valid, the legislature had a perfect right to enforce it, and their act of incorporation amounts to a legal execution of the trusts, and vests the estate in the corporation. Now, whatever may be the rights of the state, as parens patriæ, to enforce this charity, it can enforce it only as a trust. If the legal estate is vested in the heirs subject to the trust, the legislature cannot by any act, ipso facto, divest that legal title, and transfer it to the corporation. It is one thing to enforce a charitable trust, and quite another thing to destroy the legal rights of the parties to which it is attached. If the devise had been to certain trustees by name, upon trust for the charity; could the legislature have a right to divest the legal title? The case of the trustees of Dartmouth College *vs.* Woodward, 4 Wheat. Rep. 518, in its principles, bears against such a doctrine. The right to enforce the trust and operate upon the legal estate is a right to be exercised by judicial tribunals, and not by legislative decrees. The doctrine of the supreme court of New York is, that the legislature thereof has no authority to divest vested legal rights(*b*).

(*a*) See note on Charitable Uses, 4 Wheat. Rep. Appendix, 1, 11, 12. Coggeshall *vs.* Felton, 7 Johns. Cha. Rep. 292. Kirkbank *vs.* Hudson, 7 Price, 212. Duke Charitable Uses, by Bridgman, p. 361, 374, 375, 390..

(*b*) Dash *vs.* Van Cleek, 7 Johns. Rep. 477. Bradshaw *vs.* Rogers, 20 Johns,

But I cannot admit that the act of incorporation was intended to have such an effect ; it has no terms which divest the legal title of the heirs ; it merely incorporates the trustees and their successors, and clothes them with the usual powers to carry the trust into effect. It presupposes that the estate was already vested in them by the will. They are made "capable in law of holding and disposing of the estate" devised by the will. It is true that the uses are added, " and the same (estate) is hereby declared to be vested in, them and their successors in office for the purposes therein (in the will,) expressed." But this was not, as I think, intended to vest the estate in them as a legislative investiture ; but to declare that the estate was vested in them *for the purposes of the charity,* and not otherwise. The preamble of the act too shows, that the trustees did not ask to have the estate vested in them; but that inconveniences had arisen in the management of the estate from the changes of office. This is very strong to show that the legislature acted solely for the purpose of avoiding such inconveniences, and not to give them an estate to which they then had no title, and which they then professed to have in their management.

In every view, therefore, in which I can contemplate this point, I feel compelled to say that the devise, if a valid devise, is not a devise valid so as to divest the heir at law of his legal estate ; but that the devise can have effect, if at all, only as a trust for a charity fastened on the legal estate in his hands.

In this opinion as to the nature and effect of the devise, in which I have the misfortune to differ from that of the court, I am authorised to say that I have the concurrence of the chief justice.

Another question is, whether the demandant was or was not capable of taking lands in the state of New York by descent ?. And this question is presented upon four different aspects of the facts.

In order to explain the views which I take of this part of

Rep. 103.   Catlin *vs.* Jackson, 8 Johns. 520.   Terrett *vs.* Taylor, 9 Cranch, 93. Wilkinson *vs.* Leland, 2 Peters, 627, 657.

[Inglis *vs.* The Trustees of the Sailor's Snug Harbour.]

the case, it will be necessary to state some general principles upon the subject of alienage. The rule commonly laid down in the books is, that every person who is born within the ligeance of a sovereign is a subject; and, e converso, that every person born without such allegiance is an alien. This, however, is little more than a mere definition of terms, and affords no light to guide us in the inquiry what constitutes allegiance, and who shall be said to be born within the allegiance of a particular sovereign; or in other words, what are the facts and circumstances from which the law deduces the conclusion of citizenship or alienage. Now, allegiance is nothing more than the tie or duty of obedience of a subject to the sovereign under whose protection he is; and allegiance by birth, is that which arises from being born within the dominions and under the protection of a particular sovereign. Two things usually concur to create citizenship; first, birth locally within the dominions of the sovereign; and secondly, birth within the protection and obedience, or in other words, within the ligeance of the sovereign. That is, the party must be born within a place where the sovereign is at the time in full possession and exercise of his power, and the party must also at his birth derive protection from, and consequently owe obedience or allegiance to the sovereign, as such, de facto(a). There are some exceptions, which are founded upon peculiar reasons, and which, indeed, illustrate and confirm the general doctrine. Thus, a person who is born on the ocean, is a subject of the prince to whom his parents then owe allegiance; for he is still deemed under the protection of his sovereign, and born in a place where he has dominion in common with all other sovereigns. So the children of an ambassador are held to be subjects of the prince whom he represents, although born under the actual protection and in the dominions of a foreign prince. Birth within the dominions of a sovereign is not always sufficient to create citizenship, if the party at the time does not derive protection from its sove-

(a) See Calvin's case, 7 Co. 1. Doe ex dem. of Duroure, *vs.* Jones, 4 Term Rep. 300. 1 Bl. Comm.

reign in virtue of his actual possession; and on the other hand, birth within the allegiance of a foreign sovereign, does not always constitute allegiance, if that allegiance be of a temporary nature within the dominions of another sovereign. Thus the children of enemies, born in a place within the dominions of another sovereign, then occupied by them by conquest, are still aliens; but the children of the natives, born during such temporary occupation by conquest, are, upon a reconquest or reoccupation by the original sovereign, deemed, by a sort of postliminy, to be subjects from their birth, although they were then under the actual sovereignty and allegiance of an enemy.

The general principle of the common law also is, that the allegiance thus due by birth, cannot be dissolved by any act of the subject. It remains perpetual, unless it is dissolved by the consent of the sovereign or by operation of law. Upon the cession of a country it passes to the new sovereign; for the sovereign power is competent to transfer it by a voluntary grant. Upon the conquest of the country it passes by operation of law to the conqueror; who as sovereign de facto has a right to the allegiance of all who are subdued by his power, and submit to the protection of his arms. Upon the abdication of the government by one prince, it passes by operation of law to him whom the nation appoints as his successor. Thus, by the conquest of England, the allegiance of all Englishmen passed to William the Conqueror; by the abdication of James II. their allegiance passed to William of Orange; and by the cession to France of the Anglo-French provinces of England, the allegiance of the natives passed to the new sovereign. These cases are plain enough upon the doctrines of municipal law, as well as upon those which are recognized in the law of nations.

But a case of more nicety and intricacy is, when a country is divided by a civil war, and each party establishes a separate and independent form of government. There, if the old government is completely overthrown, and dissolved in ruins, the allegiance by birth would seem by operation of law to be dissolved, and the subjects left to attach themselves to such party as they may choose, and thus to become the voluntary subjects,

[Inglis *vs.* The Trustees of the Sailor's Snug Harbour.]

not by birth but by adoption, of either of the new governments. But where the old government, notwithstanding the division, remains in operation, there is more difficulty in saying, upon the doctrine of the common law, that their native allegiance to such government is gone, by the mere fact that they adhere to the separated territory of their birth, unless there be some act of the old government virtually admitting the rightful existence of the new.   By adhering to the new government, they may indeed acquire all the rights, and be subject to all the duties of a subject to such government.   But it does not follow that they are thereby absolved from all allegiance to the old government.   A person may be, what is not a very uncommon case, a subject owing allegiance to both governments, ad urtiusque fidem regis.   But if he chooses to adhere to the old government, and not to unite with the new, though governing the territory of his birth, it is far more difficult to affirm, that the new government can compel or claim his allegiance in virtue of his birth, although he is not within the territory, so as to make him responsible criminally to its jurisdiction.   It may give him the privileges of a subject, but it does not follow that it can compulsively oblige him to renounce his former allegiance.   Perhaps the clearest analogy to govern such cases is to bring them within the rule that applies to cases of conquest, where those only, are bound to obedience and allegiance who remain under the protection of the conqueror.

The case of the separation of the United States from Great Britain, is perhaps not strictly brought within any of the descriptions already referred to; and it has been treated, on many occasions, both at the bar and on the bench, as a case sui generis.   Before the revolution, all the colonies constituted a part of the dominions of the king of Great Britain, and all the colonists were natural born subjects, entitled to all the privileges of British born subjects, and capable of inheriting lands in any part of the British dominions, as owing a common allegiance to the British crown.   But in each colony there was a separate and independent government established under the authority of the crown, though in subordination to it.   In this posture of things the revo-

lution came; and the declaration of independence acting upon it, proclaimed the colonies free and independent states; treating them not as communities, in which all government was dissolved, and society was resolved into its first natural elements, but as organized states, having a present form of government, and entitled to remodel that form according to the necessities or policy of the people. The language of the declaration of independence is, that congress solemnly publish and declare, " that these united colonies are, and of right ought to be, free and independent *states; that they are absolved from all allegiance to the British crown;* and that all political connexion between them and the *state* of Great Britain is and ought to be totally dissolved; and that as free and independent *states,* they have full power to levy war, conclude peace, contract alliances, establish commerce, and do all other acts and things which independent states may of right do." It is plain that this instrument did not contemplate an entire dissolution of all government in the states; which would have led to a subversion of all civil and political rights, and a destruction of all laws. It treated the colonies as *states,* and simply absolved them from allegiance to the British crown, and all political connexion with Great Britain. The states so considered it: some of them proceeded to act and legislate before the adoption of any new constitution; some of them framed new constitutions; and some of them have continued to act under their old charters down to the present day. They treated the case as it was treated in England upon the abdication of James II. and provided for it, by resorting to that ultimate sovereignty residing in the people, to provide for all cases not expressly provided for in their laws.

Antecedent to the revolution, the inhabitants of the colonies, whether natives of the colonies, or of any other of the British dominions, owed no allegiance except to the British crown. There was not, according to the common law, any secondary or subordinate allegiance to the colony itself, or the government therein established, as contradistinguished from the general allegiance to the British crown. When, therefore, the declaration of independence absolved all the

states from allegiance to the British crown, it was an act of one party only. It did not bind the British government, which was still at liberty to insist, and did insist upon the absolute nullity of the act, and claimed the allegiance of all the colonists as perpetual and obligatory. From this perplexing state of affairs, the necessary accompaniment of a civil war, it could not escape the notice of the eminent men of that day, that most distressing questions must arise; who were to be considered as constituting the American *states*, on one side, and "the *state* of Great Britain" on the other? The common law furnished no perfect guide, or rather admitted of different interpretations. If, on the one side, it was said, that all persons born within a colony owed a perpetual allegiance to that colony, whoever might be the sovereign,' the answer was, that the common law admitted no right in any part of the subjects to change their allegiance without the consent of their sovereign, and that the usurpation of such authority was itself rebellion; for "nemo potest exuere patriam," was the language of the common law. In respect to persons who were not natives, but inhabitants only, in a colony, at the time of the assertion of its independence, there was still less reason to claim their allegiance. If they were aliens, there was no pretence to say that they could be bound to permanent allegiance against their will. If they were born in England, or elsewhere in the British dominions, out of the colony, they were as little bound to permanent allegiance; because they inhabited, not as colonists, but as British subjects. In respect to both these cases, (i. e. foreigners and British subjects,) no colony, upon assuming to be an independent state, could, against their will, make them members of the state. It would be an exercise of authority not flowing from its rights as an independent state, and at war with the admitted rights of other nations, by the law of nations, to hold the allegiance of their own subjects. In order, therefore, to make such persons members of the state, there must be some overt act or consent on their own part, to assume a character; and then, and then only, could they be deemed, in respect to such colony, to determine their right of election.

Under the peculiar circumstances of the revolution, the

general, I do not say the universal, principle adopted, was to consider all persons, whether natives or inhabitants, upon the occurrence of the revolution, entitled to make their choice, either *to remain* subjects of the British crown, or *to* become members of the United States. This choice was necessarily to be made within a reasonable time. In some cases that time was pointed out by express acts of the legislature; and the fact of *abiding* within the state after it assumed independence, or after some other specific period, was declared to be an election to become a citizen. That was the course in Massachusetts, New York, New Jersey, and Pennsylvania. In other states, no special laws were passed; but each case was left to be decided upon its own circumstances, according to the voluntary acts and conduct of the party. That the general principle of such a right of electing to remain under the old, or to contract a new allegiance, was recognised, is apparent from the cases of the Commonwealth *vs*. Chapman, 1 Dall. Rep. 53. Caignet *vs*. Pettit, 2 Dall. Rep. 234. Martin *vs*. The Commonwealth, 1 Mass. Rep. 347, 397. Palmer *vs*. Downer, 2 Mass. Rep. 179, note. S. C. Dane's Abridg. ch. 131, art. 7, sec. 4. Kilham *vs*. Ward, 2 Mass. Rep. 236, and Gardner *vs*. Ward, 2 Mass. Rep. 244, note: as explained and adopted in Inhabitants of Cummington *vs*. Inhabitants of Springfield, 2 Pick. Rep. 394, and note. Inhabitants of Manchester *vs*. Inhabitants of Boston, 16 Mass. Rep. 230, and M'Ilvaine *vs*. Coxe's Lessee, 4 Cranch, 209, 211(a). But what is more directly in point: it is expressly declared and acted upon, by the supreme court of New York, in the case of Jackson *vs*. White, 20 Johns. Rep. 313. It appears to me that there is sound sense and public policy in this doctrine; and there is no pretence to say, that it is incompatible with the known law or general usages of nations. The case of Ainslie *vs*. Martin, 9 Mass. Rep. 454, proceeds upon the opposite doctrine; but that case stands alone, and is incompatible with prior as well as subsequent decisions of the same court; and so it has been

(a) See also Chase J. in Ware *vs*. Hylton, 3 Dall. 225, 1 Peters's Condens. Rep. 199. Hebron *vs*. Colchester, 5 Day's Rep. 169.

treated by chancellor Kent, in his learned commentaries. 2 Kent's Comm. 35, 52.

Another point, which necessarily arises in the present discussion, is, whether a party, who, by operation of law, or by the express enactment of the legislature of a state, after the declaration of independence, became a citizen of the state, could afterwards, by any act of his own, flagrante bello, divest himself of such citizenship. It is clear, that during the war; however true it might be that the state by its own declaration, or by his consent, might hold him to his allegiance as a citizen, and absolve him from his former allegiance; such declaration or consent could be binding only between him and the state, and could have no legal effect upon the rights of the British crown. The king might still claim to hold him to his former allegiance, and until an actual renunciation on his part, according to the common law, he remained a subject. He was, or might be held to be, bound ad utriusque fidem regis. In an American court, we should be bound to consider him as an American citizen only; in a British court, he could, upon the same principle, be held a British subject. Neutral nations would probably treat him according to the side with which he acted at the time when they were called upon to decide upon his rights. It might well be presumed, that from various motives, numbers would change sides during the progress of the contest; some because they were compulsively held to allegiance, and others, again, from a sincere change of opinion. It is historically true, that numbers did so change sides. The general doctrine asserted in the American courts, has been, that natives who were not here at the declaration of independence, but were then, and for a long while afterwards remained, under British protection, if they returned before the treaty of peace, and were here at that period, were to be deemed citizens. If they adhered to the British crown up to the time of the treaty, they were deemed aliens; some of the cases already referred to are full to this point, and particularly Kilham vs. Ward, and Gardner vs. Ward. In respect to British subjects, not natives, who joined us at any time during the war, and remained with us up to the peace, a similar rule of deeming them citizens has

been-adopted.   The cases in 9 Mass. Rep. 454 ; 2 Pick. Rep. 394 ; and 5 Day Rep. 169, are to this effect.   The ground of this doctrine is, that each government had a right to decide for itself who should be admitted or deemed citizens ; that those who adhered to the states and to Great Britain, respectively, were, by the respective governments, deemed members thereof ; and that the treaty of peace acted by necessary implication upon the existing state of things, and fixed the final allegiance of the parties on each side, as it was then, de facto.   Hence the recognition on the part of Great Britain of our independence, by the treaty of 1783, has always been held by us as a complete renunciation on her part of any allegiance of the then members of the states, whether natives or British born.  And the same doctrine has been in its fullest extent recognized in the British courts, in the case of Thomas *vs.* Acklam, 2 Barn. & Cress. 779.   Lord chief justice Abbott, in delivering the opinion of the court on that occasion, said, that the declaration in the treaty, that the states were free, sovereign, and independent states, was a declaration that the *people composing the state* shall no longer be considered as subjects of the sovereign by whom such declaration is made.   And in a subsequent case, Auchmuty *vs.* Mulcaster, 8 Dowl. & Ryl. Rep. 593 ; S. C. 5 Barn. & Cress. 771 ; the same court held, that a native American, born before the declaration of independence, who adhered to the royal cause during the war, still retained his allegiance, and was to be deemed, not an American citizen, but a British subject.   Mr Justice Bayley, on that occasion, said, " the king acknowledges the United States to be free, sovereign, and independent states."  " Who are made independent ? The states.   Does not this mean the persons who *at that time* (of the treaty) composed the American states," 8 Dowl. & Ryl. 603.   And again he added, " the treaty, &c. &c. made those persons who were at that period of time adhering to the then American government or constituted authorities, free of their allegiance to the crown of these kingdoms, and left them to adopt their allegiance to the new government."

In Kilham *vs.* Ward, 2 Mass. Rep. 236, and Gardner *vs.*

Ward, 2 Mass. Rep. 244, note, a like doctrine was avowed. The language of the court there was, that by the treaty those who by their adherence and residence had remained the subjects of the king of Great Britain on the one part, and those who by their adherence and residence were then the people of the United States on the other part, were reciprocally discharged from all opposing claims of allegiance and sovereignty. This doctrine appears to me so rational and just, and founded upon such a clear principle of reciprocity and public policy, that it is, I own, extremely difficult for me to admit that the treaty does not indispensably require that interpretation. It is true that the treaty contains no renunciation on our part, of the allegiance of any of our citizens who had adhered to the British crown; but the reason of the omission is obvious. Great Britain claimed the allegiance of all the colonists as British subjects; she renounced by the treaty that claim as to all who *then adhered* to the American states. We acquiesced in that result; and must, in the absence of any stipulation to the contrary, be deemed to admit the allegiance to have been retained, of all whose allegiance was not expressly or impliedly renounced.

I am compelled, however, to admit the language of this court in M'Ilvaine *vs*. Coxe's Lessee, 4 Cranch, 209, 214, leads to an opposite conclusion. There is no doubt that the treaty of peace does not ascertain who are citizens on the one side, or subjects on the other. That is a matter partly of law and partly of fact; but when the fact is ascertained that the party was de facto, at the time, under the allegiance of, and adhering to either government, he is to be treated as a subject of that government, and as such, a party to the treaty. What right have the American states to say that all persons shall be deemed citizens who, at any time previous to the treaty, were deemed citizens under their laws; any more than Great Britain has, to hold all persons subjects whom she had previously deemed subjects, in virtue of their original allegiance. Each party must, I think, be presumed to deal with the other upon the footing of equal rights as to allegiance, and to act upon the status in quo the treaty found them. If, however, the case of M'Ilvaine *vs*. Coxe's Lessee is to be deemed not

an administration of local law, but of universal law and the interpretation of treaties, it overthrows the reasoning for which I contend. I cannot admit its universality of application; on the contrary, sitting in Massachusetts, I should feel myself constrained to re-examine the doctrine as applicable to that state, upon a point which affected her political rights and her soil, and which the courts of the state had the most ample jurisdiction to entertain and determine. In New York there is no decision either way; and it seems to me, therefore, that it is fit to be re-examined upon principle. I adopt the suggestion of lord chief justice Abbott in Doe ex d. Thomas vs. Acklam, 2 Barn. & Cress. 798, that the inconvenience that must ensue from considering any large mass of the inhabitants of a country to be at once citizens and *subjects of two distinct and independent states, and owing allegiance to each;* would, if the language of the treaty could admit of any doubt of its effect, be of great weight toward the removal of that doubt. The treaty ought to be so construed, as that each government should be finally deemed entitled to the allegiance of those who were at that time adhering to it(a).

With these principles in view, let us now come to the consideration of the question of alienage in the present case. That the father and mother of the demandant were British born subjects, is admitted. If he was born before the 4th of July 1776, it is as clear that he was born a British subject. If he was born after the 4th of July 1776, and before the 15th of September 1776, he was born an American citizen, whether his parents were at the time of his birth British subjects or American citizens. Nothing is better settled at the common law than the doctrine that the children even of aliens born in a country, while the parents are resident there under the protection of the government, and owing a temporary allegiance thereto, are subjects by birth. If he was born after the 15th of September 1776, and his parents did not elect to become members of the state of New York, but adhered to their native allegiance at the time of his birth,

(a) See also 1 Wood. Lect. 382. Dane's Abridg. ch. 131, art. 7.

then he was born a British subject.   If he was in either way born a British subject, then he is to be deemed an alien and incapable to take the land in controversy by descent; unless he had become at the time of the descent cast an American citizen, by some act sufficient in point of law to work such a change of allegiance.

His parents being born British subjects, it is incumbent upon those who set up the defence, to establish, that having a right of choice, his parents elected to become American citizens.   This is attempted to be deduced by operation of law, from certain resolutions and acts of the government de facto of the state of New York.   As early as the 15th of September 1776, his parents joined the British troops in New York, and remained under the protection of the British arms during the war.   At the close of the war his father withdrew (his mother being then dead) with the British authorities; and he continued ever afterwards under the protection and allegiance, de facto, of the British crown.   So far as the acts, therefore, of the parents, manifested by a virtual adherence to the British side, go, they negative any intentional change of native allegiance.   But it is said that they were bound to make their election in a reasonable time.   I agree to this; but the effect of the omission to manifest an election in favour of the state of New York, was in my judgment decisive of their adhering to the allegiance of their native sovereign.   But if it were otherwise, if the election to remain British subjects must be affirmatively established; still, I think, in point of law, under all the circumstances, an election by taking the British protection in September 1776, was within a reasonable time; and the case of Jackson *vs.* White, 20 Johns. Rep. 313, in my judgment warrants such a conclusion.

But it is said that the ordinance of the 16th of July 1776, which declares " that all persons *abiding* within the state of New York, and deriving protection from the laws of the same, owe allegiance to the said laws, and are members of the state," by necessary conclusion and operation of law made the parents of the demandant American citizens ; because they were then *abiding* within the state and deriving

protection from its laws. Now, assuming that the convention of the state of New York had plenary powers for this purpose, so as to bind a British subject not born in New York to allegiance to the state, from the mere fact of his local residence at the time (a proposition that is encumbered with many difficulties), the term "abiding," as here used, has never been construed to exclude the right of election of persons who were inhabitants at that period, to adhere to the old, or contract a new allegiance. The case of Jackson *vs.* White, 20 Johns. Rep. 313, is decisive of that.

We must then give a rational interpretation to the word, consistent with the rights of parties, and the accompanying language of the ordinance. By "abiding" in the ordinance is meant not merely present inhabitants, but present inhabitancy coupled with an intention of permanent residence. This is apparent from the next clause of the ordinance, where it is declared, "that all persons passing through, visiting, or making a *temporary stay* in the state being entitled to the protection of the laws during the time of such passage, visitation, or temporary stay, owe during the same allegiance thereto." Their "temporary stay" is manifestly used in contradiction to "abiding," and shows that the latter means permanent intentional residence. So Mr Chief Justice Spencer, in Jackson *vs.* White, 20 Johns. Rep. 3, 326, considered it. He says, "residence in this state prior to that event (the declaration of independence) imported nothing as regards the election or determination of such residents to adhere to the old or adopt the new government. The *temporary stay* mentioned in the resolution of the convention passed only twelve days after the declaration of independence by congress, and within five days after the adoption of the declaration by the convention of this state, clearly imports, that such persons who were resident here without any intention of *permanent residence*, were not to be regarded as members of the state;" they had a right to a reasonable time therefore, after the ordinance was passed, to decide whether, with reference to the new government, they would adopt a permanent residence in the state, and to become members thereof.

A similar declaration is to be found in the statute of 1777 of

Massachusetts, and there the term " abiding" has been construed not only to apply to an intention of permanent residence, but of a prospective abiding(a). The reasoning in the Commonwealth vs. Chapman, 1 Dall. Rep. 53, persuasively conducts us to a similar conclusion. This ordinance, then, cannot be deemed to dissolve the native allegiance of the parents of the demandant, unless it shall be clearly established that they intended a permanent residence in New York, and to become members of the state under the new government, anterior to their assuming British protection in September 1776.

But even admitting that his parents did elect to become citizens of New York before the 15th of September 1776, still I am of opinion that the demandant, if he was born after the British took possession of the city of New York, in September 1776, while his parents were under the protection of, and adhering to the British government de facto, was to all intents and purposes an alien born. To constitute a citizen, the party must be born not only within the territory, but within the ligeance of the government. This is clear from the whole reasoning in Calvin's Case, 7 Co. 6, a. 18, a. b.(b). Now in no just sense can the demandant be deemed born within the ligeance of the state of New York, if, at the time of his birth, his parents were in a territory then occupied by her enemies and adhering to them as subjects, de facto, in virtue of their original allegiance.

The act of the 22d of October 1779, which confiscates the estate of the parents of the demandant, throws great light upon this part of the subject; it demonstrates that they were deemed to be then adhering to the British, the enemies of the state. It begins with a preamble reciting that " divers persons holding or claiming property within this state have voluntarily been adherent to the said king (of Breat Britain), his fleets and armies, enemies to this state and the said other United States, with intent to subvert the government and liberties of this state and of the said other United States,

(a) See opinion in note. 2 Pick. Rep. 394, 395.
(b) See also Com. Dig. Alien. Bac. Abridg. Alien. A.

and to bring the same into subjection to the crown of Great Britain; by reason whereof the said persons have severally justly forfeited all right to the protection of this state, and to the benefit of the laws under which such property is held or claimed." It further declares that the public safety requires "that the most notorious offenders should be immediately hereby convicted and attainted of the offence aforesaid, in order to work a forfeiture of their respective estates, and invest the same in the people of this state." It then enacts, "that John Murray, earl of Dunmore, &c. &c. Charles Inglis of the said city (of New York), and Margaret his wife, (the parents of the demandant), &c. &c. be, and each of them are hereby severally declared to be ipso facto convicted and attainted of the offence aforesaid;" and then declares their estates forfeited. In the second section it enacts that the same persons "shall be and hereby are declared to be for ever banished from this state, and each and every of them, who shall at any time hereafter be found in any part of this state, shall be and hereby is adjudged and declared guilty of felony, and shall suffer death."

This act deserves an attentive consideration on several accounts. It is apparent, upon its face, that it is not an act which purports to be an attainder of citizens of the state only, on account of their treason in adhering to the public enemies; for it embraces persons who never were, nor were pretended to be citizens; neither does it affect to confiscate the property on account of the alienage of the persons named therein, by way of escheat. The persons described as subjects of attainder are, "persons holding or claiming property within this state," which description equally applies to citizens and British subjects, and may include foreigners of other nations. It seems, indeed, a summary exercise of the ultimate power of sovereignty, in inflicting the penalty of confiscation upon the property of enemies, jure belli. But it demonstrates clearly the sense of the legislature, that the persons named therein were at that time voluntary adherents to the British crown, and enemies of the state; and it affords a very cogent presumption of such adherence from the time that they first came under British

[Inglis *vs.* The Trustees of the Sailor's Snug Harbour.]

protection. It farther denounces such persons as enemies or traitors, who have forfeited all right to the protection of the state; and punishes them by a sentence of perpetual banishment, and makes their residence within the state a capital felony.

Such a sentence, under such circumstances, must be deemed on the part of the state, a perpetual renunciation of the allegiance of those persons, and to deprive them of the rights, and to absolve them from the duties of citizens. There can be no allegiance due where the sovereign expressly denies all protection, and compels the party to a perpetual exile. In this view of the matter, the demandant's parents were by the sovereign act of the state itself absolved from all future allegiance, even if they had antecedently owed any to the state. In this state of things, the treaty of 1783 found the father adhering to the British crown as a native born subject.

What then is the operation of the treaty of 1783? It is clear to my mind, that the father of the demandant must be considered as a party to that treaty on the British side. I say this upon the presumption, which is not denied, that he was then adhering to the British crown; and that he was there recognized and protected as a subject owing allegiance to the British crown. In this state of things the treaty must, upon the grounds which I have already stated, be deemed to operate as an admission that he was in future to owe no allegiance to the state of New York, but he was to be deemed a British subject.

The question then arises as to what was the operation of the treaty upon his son, the demandant, who was then an infant of tender years, and incapable of any election on his own part. It appears to me, that upon principles of public law as well as of the common law, he must if born a British subject, be deemed to adhere to, and retain the national allegiance of his parents, at the time of the treaty. Vattel considers the general doctrine to be, that children generally acquire the national character of their parents (Vattel, B. 1, ch. 19. sec. 212, 219); and it is certain, both by the common law and the statute law of England, that the demandant

would be deemed a British subject. The argument itself assumes that the demandant now acts officially in that character, and that ever since his arrival of age he has adhered to his British allegiance.

Upon the whole, upon the point of alienage as presented in the case, the following are my opinions under the various postures of the facts.

1. That if the demandant was born before the 4th of July 1776, he was born a British subject.

2. That if he was born after the 4th of July 1776, and before the 15th of September 1776, he was born an American citizen; and that it makes no difference in this respect, whether or not his parents had at the time of his birth, elected to become citizens of the state of New York, by manifesting an intention of becoming permanently members thereof, in the sense which I have endeavoured to explain.

3. That if the demandant was born after the 15th of September 1776, when the British took possession of New York, and while his parents were there residing under the protection of, and adhering to the British crown as subjects, de facto, he was born a British subject, even though his parents had previously become citizens of the state of New York.

4. That if the demandant was born after the 15th of September 1776, and could be deemed (as I cannot admit) a citizen of the state of New York in virtue of his parents having, before the time of his birth, elected to become citizens of that state, still his national character was derivative from his parents, and was *under the peculiar circumstances of this case,* liable to be changed during the revolutionary war; and that if his parents reverted to their original character as British subjects, and adhered to the British crown, his allegiance was finally fixed with theirs by the treaty of peace.

5. That it was competent for the British government to insist, at all times during the revolutionary war, upon retaining the allegiance of all persons who were born or became subjects; and for the American states to insist in the like manner. But that the treaty of peace of 1783 released all persons from any other allegiance than that of the party to whom they then adhered, and under whose allegiance they

were then, de facto, found.   That if the demandant's father was at that time so adhering, it was a final settlement of his allegiance on the British side ; and that the demandant, unless born after the 4th of July 1776, and before the 15th of September 1776, remained, to all intents and purposes, a British subject

6. That if the case of M'Ilvaine *vs.* Coxe's Lessee, 4 Cranch, 209, should be thought to have overturned this doctrine so that it is no longer re-examinable, still that in this case the parents had a right to elect to which government they would adhere ; and that a period up to the 15th of September 1776, was not an unreasonable time for that purpose ; and that unless some prior, clear act of election could be shown, the adherence to the British from the 15th of September to the close of the war, afforded strong evidence to repel the presumption of any prior election to become citizens, arising from the fact of *abiding* in the state up to that period.

From these views, meaning to be understood to leave any disputed facts open for inquiry, (although no other facts seem in dispute, except the actual period of the birth of the demandant) my judgment would be that the demandant was, unless he was born between the 4th of July and the 15th of September 1776, an alien at the time of the treaty of 1783, and has ever since remained so.   I agree to the doctrine in Dawson's Lessee *vs.* Godfrey, 4 Cranch, 321, that the right to inherit depends upon the existing state of allegiance at the time of the *descent cast*, and not merely upon a community of allegiance at the time of birth ; and the same doctrine is recognized in the fullest manner in the British courts(*a*).   If the demandant then was an alien at the time of the descent cast, he is incapable to inherit the estate in point of law.

But it has been suggested as matter of doubt, whether alienage of the demandant can be taken advantage of or rejected on the mise joined.   This objection cannot in my opinion be maintained ; it is laid down in the books that every thing in bar upon the merits may be given in evidence under

(*a*) Doe ex dem, Thomas *vs.* Acklam, 2 Barn & Cress. 779.

the mise, except collateral warranty ; so it is said in Brooks's Ab. Droit, 48 ; and Booth on Real Actions, 112. That also seems to have been the opinion of the court in Tyssen *vs.* Clarke, 2 Wils. Rep. 541. Whether the proposition can be maintained in its general latitude, it is unnecessary now to consider ; but it is certainly necessary for the demandant to prove his title as set forth in the writ. If he claims by descent from an ancestor who was seised, he must show that he is heir, and capable to take by descent. The seisin of the ancestor is nothing without establishing his heirship. The cases of Green *vs.* Liter, 8 Cranch, 229, and Green *vs.* Watkins, 7 Wheat. Rep. 28, are decisive that in a writ of right the title and mere right of each party are in issue ; and each may establish that the title of the other wholly fails. If, therefore, the demandant has no title by descent, the tenant may show it ; for it goes to the very foundation of his claim.

In this connexion it may be well to dispose of another objection, which was much pressed at the argument. It is this : the demandant in his count alleges the seisin of Robert R. Randall, and makes title by descent to the premises as his next collateral heir on the part of his mother. At the death of Robert R. Randall, he left a brother Paul R. Randall, and a sister, Catherine Brewerton, on whom the alleged right to the lands descended in moieties, and *through whom* (though not *from* whom) the demandant deduces his title by descent, they having died without issue. The tenants offered evidence to establish that Catherine Brewerton had disposed of her right in the premises by will ; and that the right of Paul R. Randall also had been transferred during his life time. Now the objection is, that this evidence is inadmissible, because it is an attempt to set up the title of third persons, to defeat a recovery in a writ of right, which is inadmissible. The cases of Green *vs.* Liter, 8 Cranch, 229, and Green *vs.* Watkins, 7 Wheat. Rep. 28, have been relied on to support this objection. Nothing is better settled in this court than the doctrine that a better title in third persons cannot be set up to defeat a recovery in a writ of right, because that writ brings into controversy and comparison the titles of the par-

ties only ; but it is perfectly consistent with this doctrine, that the tenant may show that the title set up by the demandant is in fact no title at all. One material allegation in the present count is its seisin of Robert R. Randall the ancestor ; and this seisin is admitted, and indeed constitutes a part of the title of both parties in the present case. Another material allegation is, that the *right* to the demanded premises *descended* to the demandant as heir. Now, it is clear upon the general principles of pleading, that what is essential to the demandant's right, as stated in his count, must, when that right is denied by the issue, be proved by the demandant, and may be disproved by the tenant. If, therefore, the demandant be incapable of taking as heir by descent, although there be a *right*, that may be shown by the tenant ; as if he be an alien, because it defeats the asserted *descent* of the title. On the other hand, if the heirship be admitted, and the *right,* was parted with by the ancestor, or by any other person, upon whom it intermediately devolved before it could reach the demandant, that, for a better reason, may be shown, because it shows that no *right* or *title* descended at all. Both are necessary to establish the demandant's claim ; there must be a *right* or title subsisting, capable of descent, and a capacity in the demandant to take as heir. If the ancestor has actually parted with his whole right and title in the premises by a legal conveyance, how can it be said that there remains any *descendible right* in him ? If his right has been parted with by any intermediate heir by a legal conveyance, how can it be said to have devolved upon the demandant ? The true and real distinction is this : if the demandant shows any right, as stated in his count to have descended to him from his ancestor, the tenant cannot show that there is a better right subsisting in a third person, under whom he does not claim, for that does not disprove the title of the demandant as asserted in his writ ; and if the demandant's title, such as it is, is better than the tenant's, then the demandant ought to recover ; but the tenant may show that the demandant has no right whatsoever by descent, for the possession of the tenant is sufficient against any person who does not show any right, or a better right. And this,

as I understand it, is the doctrine in Green vs. Watkins, 7 Wheat. Rep. 28. Here, title in third persons is offered, not to prove that there is a *better* outstanding title, but that no right whatsoever descended to the demandant, as he claims in his count. It seems to me that it is clearly admissible.

The next point is whether the will of Catherine Brewerton was sufficient to pass her right and interest in the premises in question, so as to defeat the demandant in any respect; the premises being at the date of the will, and ever since, held adversely by the tenants in the suit.

If this point were to be decided with reference purely to the common law of England, there might be some reasons for doubt. The question whether a right of entry was under the British statute of wills devisable, seems never to have been directly decided until a recent period. There is indeed to be found in prior cases, many dicta going to affirm the doctrine that such a right of entry is not devisable. Such seems to have been the opinion of Lord Holt in Bunker vs. Cook, 11 Mod. R. 122, and of Lord Eldon in Attorney General vs. Vigor, 8 Ves. 282, as well as of other judges in former times, whose dicta are collected and commented on in Goodright vs. Forrester, 8 East's Rep. 552, 566, and 1 Taunt. Rep. 604(a). There are also dicta the other way; and at all events there is reasoning which leads to the conclusion, that in modern times the judges have been disposed to give a far more liberal construction to the statutes, and to hold that whatever is descendible is devisable. The cases of Jones vs. Roe, 3 Term Rep. 88, and Goodtitle d. Gurnall vs. Wood, Willes's Rep. 211, 3 Term Rep. 94, by Lord Kenyon, are most material. In Goodright vs. Forrester, 8 East's Rep. 552, the court of king's bench held a right of entry not devisable. But when that case came before the court of the exchequer chamber in error, lord chief justice Mansfield very much doubted that point, and the case was finally decided on another. But it is the less necessary to consider this question upon the English authorities, because it has undergone an express adjudication in the state of New

(a) See also Com. Dig. Devise, M.

York, upon the construction of their own statute of wills. The statute of New York enacts that any person having an estate of inheritance in lands, tenements and *hereditaments*, shall have a right to devise them. In Jackson *vs.* Varick, 7 Cowen's Rep. 238, the supreme court of New York, upon very full consideration, held, that under this statute a right of entry being an hereditament, was devisable. And this court in Waring *vs.* Jackson, 1 Peters's Rep. 571, understood it to be the settled rule in that state that an adverse possession did not prevent the passing the property by devise. This then being a point of local law, upon the construction of a statute of the state, according to the uniform course of this court in cases of that nature we should hold it decisive, whatever original doubts might otherwise have surrounded it. But as one, I confess myself well satisfied with that decision upon principle. It is rational and convenient; and if I should have felt difficulty in arriving at it through the authorities, I should not be inclined to disturb it when made.

It has been said that the present case differs from that in 7 Cowen's Rep. 238 in this, that the demandant claims *through*, but not *under* Mrs Brewerton, not as her heir, but as heir of Robert R. Randall; and that the estate was not descendible to her *heirs* according to the known principles of the common law, as she was never seised of the premises, but to Robert's heirs, as the person last seised. That is true; but it does not alter the application of the principle of law. If Mrs Brewerton had been possessed of a reversion by descent from Robert R. Randall, and she had died before the life estate fell in, it would not have gone to her heirs, but to *his*. And yet there is no doubt that she might grant such a reversion, or devise it, and it would pass by her will to the devisee and thus interrupt the descent. So, if Mrs Brewerton had a right of entry in the premises, and she could devise it, it is of no consequence that it would not, if undevised, have passed to her heirs; for having the jus disponendi, when she exercises it it passes her right to her devisee, and so interrupts the descent to the heirs of Robert

R. Randall. It appears to me, therefore, that as to the moiety of Mrs Brewerton it passed under her will, and that the demandant, in any view of his claim, has no title to a moiety of the demanded premises. A right of entry may well pass under the devise of an hereditament(a).

The next question is, whether the proceedings against Paul R. Randall as an absent and absconding debtor passed his right or interest to the other moiety in the lands in question to, and vested the same in the trustees appointed under the same proceedings, so as to defeat the demandant in any respect.

The answer must depend upon the true construction of the absconding debtor acts of 1786 and 1801, as compared with those proceedings. At the time of those proceedings, the premises were in the adverse possession of the tenants; and consequently Paul R. Randall had only a right of entry. And the question is, whether that right of entry passed by the statutes to the trustees; and if so, whether it did not by operation of law revest in him after all these proceedings were *functi officio*, his debts being paid and the surplus paid over to him.

At the common law a right of entry is clearly not grantable or assignable. The party has, in the sense of the common law, no *estate* in lands of which he is disseised; but his estate is said to be turned to a right, and can be recoverable only by an entry or an action. In the mean time he has not any estate in the lands, but he has merely the right to the estate. For this doctrine it is necessary to do no more than to refer to Littleton, sec. 347; Co. Litt. 214 and 345, a. b.; Preston on Estates, 20, and Com. Digest, Assignment, C. 1, 2, 3, and Grant, D,(a). Unless it shall appear that the common law has been differently construed in New York, or altered by some local statute, the same rule must be presumed to prevail there; for, by the constitution of that state, the common law forms the basis of its jurisprudence. No case has been cited in which the rule of the common law on

(a) See Coffin vs. Smith, 2 H. Bl. 444.

[Inglis *vs.* The Trustees of the Sailor's Snug Harbour.]

this subject has been overturned, or in which it has been decided that the word "estate" includes a right of entry, proprio vigore.

But it is said that by the law of New York a right of entry is attachable, and may be taken and sold on execution; and that an attachment under the absconding debtor acts of 1786 and 1801, is deemed analogous to an execution(*a*). It may, doubtless, well be so deemed in a general sense; but it by no means necessarily follows that because there is such an analogy, therefore, whatever may be taken in execution may be taken on such attachment, or, e converso. The subject of levies under execution, is expressly provided for by the statute of New York of the 31st of March 1801; and what effects or estate may be taken in execution depends upon the true construction of the terms of that act. It declares that "all the *lands, tenements,* and *real estate*" of every debtor shall be liable to be sold upon "execution," &c. for the payment of any judgment against him for debt or damages. What has been the judicial construction of these words in this act, whether they include a right of entry, does not, as far as my researches extend, appear ever to have been decided. It is indeed suggested by Mr Justice Woodworth, in delivering the opinion of the court in Jackson *vs.* Varick, 7 Cowen's Rep. 238, 244, that the reasonable construction is, that it includes such a right; but the point was not then before the court, and he does not treat it as a point settled by adjudication. The words to which he refers in another part of the act, giving the form of the execution (sec. 9), in which it is confined to lands and tenements *whereof the debtor was seised* on the day when the same land became liable to the debt (by the judgment), would rather incline one to a different conclusion. And it is certain that under the statute of Westminster 2, ch. 18, subjecting lands to execution, lands of which the debtor is disseised at the time of the judgment cannot be taken in execution(*b*). Be this as it may, it is certain that in New York the process

(*a*) Matter of Smith, 16 Johns. Rep. 102.
(*b*) 1 Roll. Abridg. 888, Com. Dig. Execution, c. 14.

upon executions, and under the absconding debtor act are not co-extensive in their reach. A judgment is not a lien upon a mere equity; and such an equity (not being an equitable estate under the statute of uses of 1787, sec. 4), is not an interest which can be sold on execution. And choses in action do not appear to be within the scope of the act respecting executions; for the language confines it to "*goods* and *chattels*." Yet choses in action by the express terms of the absconding debtor acts pass under the attachment; and there are various other interests which may well pass under these acts, which yet are not liable to be taken under a common execution. Several cases illustrative of this position, will be found collected in Mr Johnson's Digest, title Execution 2(*a*).

It appears to me, then, that the true mode, by which we are to ascertain whether a right of entry passes under the absconding debtor acts, is not by any forced analogy to the case of common executions, but by a just interpretation of the terms of the act themselves. The act of 1801 is in substance a revision of the act of 1786; no material distinction between them, applicable to the case before the court, has been pointed out at the argument; and they may therefore be treated as substantially the same.

The act of 1801 begins (section 1) by providing for cases of absconding and absent debtors, and upon proof thereof, provides that a warrant shall issue to the sheriff commanding him to attach and safely keep " all the estate *real* and *personal* of such debtor," and make and return a true inventory thereof. Goods, effects and choses in action are expressly declared to be within the reach of the act. It afterwards proceeds to provide for the appointment of trustees, and authorizes them (section 2.) " to take into their hands all the *estate* of such debtor, whether attached as aforesaid, or *afterwards discovered by them*, and all books, vouchers and papers relating to the same; and the said trustees, from their appointments, *shall be deemed vested with all the estate of such debtor*, and shall be *capable to sue for and recover the same*; and all debts and things in action due or belonging to such debtor, and all the estate attached as aforesaid,

shall be by the sheriff, &c. delivered to the said trustees; and the trustees, or any two of them, shall sell at public vendue after fourteen days previous notice of the time, and place, *all the estate, real and personal of such debtor as shall come to their hands,* and deeds and bills of sale for the same make and execute, which deeds and bills of sale shall be as valid as if made by such debtor," &c. The act afterwards goes on to provide for the distribution of the proceeds of the sales among the creditors, and then declares, that "*the surplus,* if any, after all just debts and legal charges as aforesaid are satisfied, *shall be paid to such debtor or his legal representatives.*" There is no provision in the act as to what shall be done in respect to any property which never came to the hands of the trustees, nor of any property remaining unsold by them when all the debts were satisfied; and the omission may easily be accounted for from the general policy of the act; for the language is, that the trustees shall sell *all* the estate *which comes to their hands.* If the point were material I should strongly incline to the opinion, that the act did not *absolutely* divest all right and title out of the debtor of any of his estate, *which should not come to the hands of the trustees and be sold by them.* But whether this be so or not, I am clearly of opinion that when once all the purposes of the trust are satisfied, and all the debts are paid; if the trustees have any legal interest or title vested in them in the estate of the debtor remaining unsold, it is subject to a *resulting use* for the benefit of the debtor, in the same manner as the surplus of the property sold. Suppose, before the sale, all the debts should be paid, must the trustees go on to sell? Suppose all the debts are paid by a sale merely of the personal estate, is not their trust extinguished? The trustees take all the estate in the first place for the benefit of the creditors, and in the next place, they being paid, for the benefit of the debtor. Subject to the rights of the creditors, the use is in him; and by operation of law the estate revests in him, as soon as the trust for the creditors is exhausted or extinguished. This seems to me a reasonable, if not a necessary construction of the act; for it has provided for no express reconveyance

by the trustees to the debtor, in any case whatsoever. It certainly could not intend to deprive him of his inheritance after all his debts were paid. And it is but just to give the act a construction favourable to the debtor, when all its other objects are accomplished. In the present case the whole proceedings afford a strong presumption that all the debts of P. R. Randall have been paid; and none are pretended to exist. His right of entry in the demanded premises was never sold by the trustees; and even if it vested in them, it afterwards by operation of law revested in him, if the trusts were all defunct and satisfied. But I go farther, and incline to the opinion that his right of entry in the demanded premises did not pass to the trustees under either of the attachments. The language of the acts of 1786 and 1801 is indeed quite broad, and extends to all the "estate real and personal" of the debtor. But a right of entry is not, as has been already shown, an "estate" in any just and legal sense of the word. Neither is it a "thing in action;" for it does not depend upon any right to sue, but may be enforced by a mere entry. Indeed, a right of action and a right of entry are often used in contradistinction to each other.

The case of Smith, &c. vs. Coffin, 2 H. Bl. 444, turns altogether upon other considerations, and upon the interpretation of the words of the English bankrupt laws. Words of a very broad import are used in those laws; and the policy of them is far more extensive than that which governs the laws of New York, now under construction. A construction might be properly adopted in respect to the bankrupt laws, which would not apply to the absconding debtor acts of New York. The general policy of the common law is to discourage the grant or sale of mere rights of entry and action, with a view to suppress litigation. This policy spreads itself over many important interests; and is so fundamental, that nothing but a very clear expression of the legislative intention ought in my judgment to overthrow it. No such intention is to be found in the acts of 1786 and 1801. Can it be reasonably presumed that the legislature meant to authorise the sale of a right of entry to a purchaser? If not, was it the intention to enable the trustees

to reduce the right into possession, and afterwards to sell the same? I think the former was manifestly not the intention of the legislature; and I found myself on the very words of the acts. The trustees are to sell, not all the estate of the debtor, but all the estate real and personal, "*as shall come to their hands;*" that is, as I construe the words, such as they shall reduce into possession; so that the estate may bring its uncontroverted value. But for the reasons already stated I incline also to the opinion, that it was not the intention of the legislature to pass the right of entry to the trustees so that they might be enabled to reduce it into possession.

But supposing it to be otherwise; still it appears to me there is much reason to contend that the trustees, if they took the right of entry at all, took it *sub modo* and exactly as Paul R. Randall held it. The legislature did not intend to invest them with a better right than he had. He had a right of entry into the estate vested in him by descent, and he might perfect his estate by an actual entry during his life time. But if he died without such entry, then the right to the estate devolved not upon his own heir, but upon the next heir in the line of descent of Robert R. Randall. In this view of the act, the trustees were bound, then, to reduce the right of Paul R. Randall into possession during his life time, if they meant to perfect their title thereto. Not having done so, the title devolved upon the next heir who claimed, not through them, but from the ancestor from whom Paul R. Randall took it. This, however, is not the main ground on which I rely, though it fortifies some of the considerations already mentioned. The main ground on which I rely is, that whatever construction of the act may be adopted in other respects, as soon as all the trusts of the assignment are executed, there arises a resulting use to the debtor, which, by operation of law, will revest all the unsold estate in him.

Upon the whole, my opinion is, that the proceedings against Paul R. Randall did not pass his right or interest in the lands in question, so as to defeat the demandant in any respect; but if they did, and all the trusts have been satisfied, there is a resulting use to him in the unsold estate.

The next question is, whether, inasmuch as the count in

the cause is for the entire right in the premises, the demandant can recover a less quantity than the entirety.

This is a question somewhat involved in technical learning, and therefore requires an accurate examination of the authorities. Reasoning upon general principles and the analogies of the law, there would be little difficulty in deciding it in the affirmative; for it is deciding no more than that he who has a right, shall recover according to his right, so, always, that he does not recover more than he sues for. No injury is done to the tenant by allowing the demandant who sues for ten acres and shows a title only to one, to recover for the latter; nor if he sues for an entirety and shows title to a moiety, to recover for the latter. And it is in furtherance of justice that he should so recover; because it prevents multiplicity of suits. For if his suit should abate for this fault, (and that is the only judgment which could be pronounced,) he would still be entitled to a new action for the part to which he had shown title. The falsity of the former writ would constitute no bar.

Let us see, then, how the case stands upon authority. By the old common law, if the writ of the demandant was falsified by his own *confession* (for it is far from being certain that it was ever true, when found by a *verdict* upon the merits, after the general issue joined)(*a*), as to any thing or part of a thing demanded in the writ, it abated for the whole. If the matter did not appear on the face of the record, but was to be made out by facts dehors, then the tenant, if he meant to avail himself of it, was compelled to do it by a plea in abatement. Thus if he meant to avail himself of non-tenure of the whole, or a part, he must plead it. But where, upon the whole record, the falsity of the writ was apparent by confession of the party, there, although the tenant had not pleaded in abatement, it was the duty of the court, ex officio, to abate the writ.

Now, at the common law, there are two sorts of writs in

(*a*) See Plowden, 424, 6. Hobart's Rep. 282, 6. Fitz. Abridg. Breve, 272. 9 Hen. 6, 54. 11 Co. 45. Theol. Dig. Lib. 16, ch. 5.

real actions. In one the demand is in a general form, without specification of any lands in particular. Thus in the writ of assise, the demand is that the tenant " unjustly and without judgment hath disseised him of *his freehold in C.*"(*a*), without any further description of the land. So in writs of dower, the demand is of the demandant's " reasonable dower, which falleth to her *of the freehold,* which was of A. her late husband in C., whereof she hath nothing,"(*b*) without more. The plaint or count is less general, and specifies the particulars of the demand, as a messuage, ten acres of land, &c.(*c*) In the other sort of writs, the writ itself is as special as the count. Such is the case of all precipes quod reddat, such as writs of right, and writs of entry, &c. where the demand is of a certain messuage, or ten acres of land, &c. &c. and the exigency of the writ is that the said tenant should render the same to the demandant without delay(*d*). Now, it was upon this difference that a distinction took place in the common law as to the right of the demandant to abridge his demand. If the writ was special, he could not abridge his demand in any case. If the writ was *general,* de libero tenemento, he might abridge his demand at his pleasure, so always that he did not abridge it of a moiety or portion, where he sued for the *entirety* of a thing ; as if he sued for ten acres he might abridge it to five ; but if he sued for the whole of a messuage, he could not abridge it to a moiety. This doctine will be found at large in many cases ; but it is no where better expounded than in the opinion of Mr. Justice Juyn, (afterwards chief justice) in 14 Hen. 6, p. 3, 4. He said, " that in all cases where the writ is de libero tenemento generally, as in assise and writs of dower, where the writ is of her reasonable dower, &c. the demandant may abridge his plaint or demand ; and the reason is because although he abridges some acres, yet the writ remains true as to the rest, it being liberum tenementum still. But where a cer-

(*a*) Booth on Real Actions, 210. Fitz. N. B. 177.

(*b*) 2 Saund. Rep. 43. Booth on Real Actions, 166. Fitz. N. B. 147.

(*c*) Com. Dig. Assize, B. 11. Booth on Real Actions, 212, and note.

(*d*) Fitz. N. B. 1, 5, 191. Booth Real Actions, 1, 83, 88, 91, 172.

tain number of acres is demanded in the writ, as in a forme-
don, the demandant cannot abridge, for he acknowledges his
writ false ; and where a writ is acknowledged to be false in
part, it must abate it in the whole ; but if in an assise the writ
be, he unjustly disseised him de libero tenemento in A. and B.
and he would abridge his demand as to all in B. he shall not
abridge ; for his writ is false, which supposes him disseised
of the tenement in A. and B." As to this last position there is
some difference in the authorities; but the general position
is unquestionable law(*a*). But this doctrine even in relation
to assises was of little value to the demandant in many
cases, because it stopped short of the most common sources
of mistake. If, therefore, he counted against one as tenant
of the *whole*, and he pleaded non tenure as to part, or joint
tenancy, &c. and it appeared by confession or otherwise,
that the plea was true, the writ abated as to the whole, for
the falsity of the writ was established in this, that the tenant
was sued as the tenant of the *whole*, and was tenant only of
*part.* This mischief was cured by the statute 25 Edw. 3,
ch. 16, which provided, " that by the exception of non tenure
of parcel, no writ shall be abated but for the quantity of the
" non tenure, which is alleged"(*b*). Still, however, many dif-
ficulties remained behind ; for if a party sued for an entirety,
as of a manor, or a messuage, or one acre, and a bar was
pleaded as to a moiety, or part of the land put in view, &c.
in the plaint, the defendant could not abridge his plaint to
the moiety left, since his writ was for an entirety, and so far
false : the distinction was nice, for he might abridge his
plaint from two or ten acres to one acre ; but not as to the
extent of his title or right in the land put in view. Such,
however, as the distinction was, (and it suited the subtilty
of the times,) it prevailed until the statute of 21 Hen. 8, ch.
3, which provided, that in assises the demandant might in
all such cases abridge his plaint, and proceed for the resi-

(*a*) See Com. Dig. Abridg. A. 2 Saund. Rep. 44, and note 4. Gilb. Com. Pl.
199, 201, 202, 203. Brooks, tit. Abridg. 14 Hen. 6, p. 4. 9 Hen. 6, p. 42. 3 Lev.
68. Vin. tit. Abridg. Theol. Dig. Lib. 16, ch. 2. Bac. Abridg. Abatement, L.
(*b*) See Gilb. Hist. C. P. 201.

[Inglis *vs.* The Trustees of the Sailor's Snug Harbour.]

due(*a*).   But this statute is confined to assises ; and, there-
fore, left the common law in full force as to all other real
actions.

Such is a brief review of the doctrine at common law in
respect to the abridgement of plaints by the demandant. It,
is not, however, to be imagined that the old authorities are
all in harmony on this subject.   On the contrary, diversities
of opinion seem to have existed from an early period. In
Godfrey's case, 11 Co. 42, 45, the court proceeded mainly
on the rule already stated.   Lord Coke, however, thought
that the common and true rule and difference is where a
man brings an action, be the suit general or certain and
particular, and he demands two things, and it appears of his
own showing that he cannot have an action or better writ
for one of them, there the writ shall not abate for the whole,
but shall stand for that which is good.   But when a man
brings an action for two things, and it appears that he can-
not have this writ for one thing, but may have another in
another form, there the writ shall abate for all, and shall not
stand for that which is good.   The distinction has sound
sense in it ; but it is inapplicable to the present case ; be-
cause here, the plaintiff has not shown upon the pleadings,
that he has no title to maintain his writ for the whole(*b*).

Writs of precipe quod reddat then, except so far as the
statute 25 Edw. 3, of nontenure aided them, stood upon the
footing of the common law.   In respect to them, therefore,
the demandant could not abridge his claim except in cases
of nontenure ; and if his writ could not by his own confession
be maintained for the whole for which he sued, his writ abated
for the whole ; and it was not material whether he sued for
the entirety of a certain number of acres, and showed title
to a less number ; or whether he sued for the whole or a
moiety, and showed title only to a less aliquot part(*c*).   But

(*a*) See Com. Dig. Abridgement, B.  Viner, tit. Abridgement.  Theol. Dig. Lib.
8, ch. 28.  Id. Lib. 16, ch. 2.  Keilway, 116, pl. 56.  5 Hen. 7.  19 Hen. 6, 13.
Brooks, Abridgement, pl. 2.

(*b*) See 1 Saund. R. 282, 285, note 7. .Com. Dig. Abatement, M. N.   Cro.
Jac. 104.  Theol. Dig. B. 8, ch. 28, sec. 13.  9 Hen, 7, 4. (b).

(*c*) See Com. Dig. Abatement, L. 1, 2. M.   Saville's R. 86.   Clanrickard *vs.*
Sidney, Hob. 273, 274, 279, 282.  Com. Dig. Abridgement, B.   Chatham *vs.*

unless the falsity of his writ appeared by his own confession, even though it appeared by the verdict, the better opinion was that the writ was not abated for the whole. Plowden, indeed, in Bracebridge *vs.* Cook, Plowden, 424, thought the objection fatal. But lord Hobart, in Clanrickard *vs.* Sidney, Hob. 272, 282, condemned that opinion as erroneous, and against common experience in his day. And in this last case it was further held that the variance was but matter of form, and at all events cured by the statute of jeofails of 18 Elizabeth, ch. 14, after a verdict, even though it appeared by *confession* of the party, upon the pleadings. In that case the writ was formedon for an entirety ; and upon the demandant's own confession it appeared that he was entitled to recover but two thirds. But the court held, that the parties having gone to trial upon an issue, and the jury having found a special verdict in favour of the plaintiff for the two thirds, his suit was not abateable for the whole, but the error was cured by the statute of jeofails of 18 Elizabeth, ch. 14(*a*). Whoever will read lord Hobart's learned opinion upon that occasion will perceive the most solid reasons brought in support of it. The doctrine that if a demandant sue for an entirety, he may yet after verdict recover for a moiety, is not only supported by the case in Hobart's Rep. 172, but by the case Cooper *vs.* Frankling, 1 Roll. Rep. 384. S: C. 3 Bulst. 148, and 2 Roll. Ab. Trial, p. 719, pl. 12. The doctrine, that if he sue for a moiety he may recover for a less aliquot part, may be deduced from the same causes, for it stands upon the same reasoning as that applicable to entireties. So was the reasoning in Saville's Rep. 48, pl. 165(*b*). There are many cases in ejectment where the same doctrine has been maintained, and in none of them has any distinction been asserted between an ejectment and real actions. The ground of argument has been the variance between the count and verdict ; so that it has turned upon the falsity of the plaintiff's

Sleigh, 3 Lev. 67. Viner, tit. Abridgement. Fitzherbert's Abridgement, tit. Breve, 272. Plowden, 424.

(*a*) See Bacon's Abridgement, Amendment, B. Theol. Dig. Lib. 16, s. 15, 18. 2 Roll. Ab. 719, pl. 19. Cooper *vs.* Frankling, 1 Roll. R. 384. S. C. 3 Bulst. R. 148.

(*b*) See Scot and Scot's case, 4 Leon. R. 39. Com. Dig. Abatement, M.

[Inglis vs. The Trustees of the Sailor's Snug Harbour.]

claim and title as propounded in his writ and proved at the trial. So was the case of Ablett vs. Skinner, 1 Sid. 229, where the ejectment was for one fourth part of a fifth part; and the plaintiff's title upon the trial was but one third part of a fourth of a fifth part; and yet it was held that he was entitled to recover according to his title. That case was recognized and fully confirmed in the case of Denn d. Burges vs. Purvis, 1 Burr. Rep. 326; where in ejectment the plaintiff sued for a moiety and recovered a third. Lord Mansfield relied on the analogous doctrine in cases of assise.

It may then be assumed as certain, that from the time of lord Hobart the general doctrine has been, that the demandant in any real action is entitled to recover less than he demands in his suit, whether he demands an entirety or an aliquot part, if the variance is not taken advantage of until after a verdict found on trial had. If, indeed, the matter is pleaded in abatement, it is fatal to the whole suit. So if it appears of record by the confession of the demandant in the course of the pleadings, the writ is abateable for the whole, if the tenant choose to take advantage of it before verdict. But if the parties go to trial upon the merits, and a verdict, general or special, is found of any part for the demandant, there the variance between the writ and the title, even though by the confession of the demandant upon the pleadings, is cured by the statute of amendments of 18 Elizabeth, ch. 14. This, then, being the state of the law at the time of the emigration of our ancestors, and the statute of Elizabeth being a remedial and not a penal law, and the general principle being that statutes made in amendment of the law before that period constitute a part of our common law; the court might, if it were necessary, resort to this principle to support the present suit. But such a resort is not necessary; because, in the first place, the present case is not one where the defect appears upon the confession of the party; but if at all, appears from facts proved at the trial upon the general issue. In the next place, the provisions of the judiciary act of 1789, ch. 20, sec. 32, upon the subject of amendments and jeofails, are far more extensive than the English statutes, and would justify the most comprehensive construction in

favour of the demandant. And in the last place, the original nicety of the common law doctrine upon this subject, at least since the time of lord Hobart, seems to have given way (where the matter was not pleaded in abatement) to the doctrine of common sense. As far as we can trace it, it has been long established in England. Its existence in America has never been maintained by any positive decision in its favour. On the contrary, in Massachusetts, where real actions constitute the ordinary remedy for disseisins and ousters, it has been solemnly adjudged, upon a careful consideration of the English authorities, that the demandant may in all cases recover less than he sues for, whether he sues for an entirety or an aliquot part. So are the cases of Dewy *vs*. Brown, 2 Pick. Rep. 387 ; and Somes *vs*. Skinner, 3 Pick. Rep. 52 ; and the opinion of very able commentators upon this branch of the law(*a*). There is nothing in the case of Green *vs*. Liter, 8 Cranch, 229, 242, which trenches upon this doctrine. So far, indeed, as that case goes, it is favourable to the demandant.

I have not thought it necessary to go into a particular examination of the point, whether, if the variance between the demandant's title and his demand in his writ be apparent only by the finding of the jury upon the general issue, and not by the pleadings of the parties, or the confession of the demandant, the writ was abateable for the whole, upon the old doctrine of the common law. There is much reason to believe, as has been already intimated, that under such circumstances the variance was never fatal to a recovery pro tanto ; and the modern doctrine in England is certainly in favour of a recovery. But whether it be so or not, independent of the statute of jeofails, that statute certainly cures the defect upon the principles already stated.

Upon the whole my opinion is, that this question ought to be certified in favour of the demandant.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the

(*a*) Jackson on Real Actions, 296.   Stearns on Real Actions, 204.

[Inglis vs. The Trustees of the Sailor's Snug Harbour.]

southern district of New York, and on the questions and points on which the judges of the said circuit court were opposed in opinion, and which were certified to this court for its opinion, in pursuance of the act of congress for that purpose made and provided, and was argued by counsel; on consideration whereof, it is the opinion of this court:

I. That although the count in the cause is for the entire right in the premises, the demandant may recover a less quantity than the entirety.

II. And under the second general point, the following answers are given to the specific questions:

1. If John Inglis, the demandant, was born before the 4th of July 1776, he is an alien, and disabled from taking real estate by inheritance.

2. If he was born after the 4th of July 1776, and before the 15th of September of the same year, when the British took possession of New York, he would not be under the like disability.

3. If he was born after the British took possession of New York, and before the evacuation on the 25th of November 1783, he would be under the like disability.

4. If the grand assise shall find, that Charles Inglis the father, and John Inglis the demandant, did, in point of fact, elect to become and continue British subjects, and not American citizens, the demandant is an alien, and disabled from taking real estate by inheritance.

III. The will of Catherine Brewerton was sufficient to pass her right and interest in the premises in question, so as to defeat the demandant's right to recover, so far as her right or interest extended.

IV. The proceedings against Paul Richard Randall, as an absent debtor, passed his right or interest in the lands in question to, and vested the same in the trustees appointed under the said proceedings, so as to defeat the demandant's right to recover so far as his right or interest extended; unless the grand assise shall find, that the trusts vested in the trustees have been performed; and if so, the said proceedings will not defeat the demandant in any respect.

V. The devise in the will of Robert Richard Randall of the lands in question is a valid devise, so as to divest the heir at law of his legal estate.

Whereupon it is ordered and adjudged by this court to be certified to the judges of the said circuit court of the United States for the southern district of New York:

I. That although the count in the cause is for the entire right in the premises, the demandant may recover a less quantity than the entirety.

II. And under the second general point, the following answers are given to the specific questions:

1. If John Inglis, the demandant, was born before the 4th of July 1776, he is an alien, and disabled from taking real estate by inheritance.

2. If he was born after the 4th of July 1776, and before the 15th of September of the same year when the British took possession of New York, he would not be under the like disability.

3. If he was born after the British took possession of New York, and before the evacuation on the 25th of November 1783, he would be under the like disability.

4 If the grand assise shall find, that Charles Inglis the father, and John Inglis the demandant, did, in point of fact, elect to become and continue British subjects, and not American citizens, the demandant is an alien, and disabled from taking real estate by inheritance.

III. The will of Catherine Brewerton was sufficient to pass her right and interest in the premises in question, so as to defeat the demandant's right to recover, so far as her right or interest extended.

IV. The proceedings against Paul Richard Randall, as an absent debtor, passed his right or interest in the lands in question to, and vested the same in the trustees appointed under the said proceedings, so as to defeat the demandant's right to recover so far as his right or interest extended; unless the grand assise shall find, that the trusts vested in the trustees have been performed; and if so, the said proceedings will not defeat the demandant in any respect.

V. The devise in the will of Robert Richard Randall of the lands in question, is a valid devise, so as to divest the heir at law of his legal estate.

All of which is accordingly hereby certified to the said circuit court.

----

Mr Webster, on a subsequent day of the term, submitted to the court an application in behalf of the demandant, for a re-argument of this case. He presented, as the ground of the application, a statement in writing signed by the counsel in the case, Mr Ogden and himself, representing " that the question in this cause, which arises on the construction of the will of Robert Richard Randall, is one, not only of great importance, but certainly of no small difficulty. The case was argued at a time when there were six judges on the bench. At the time of the decision there were but five judges living who had heard the cause ; of these five, three were against the demandant upon the construction of the will, being a minority of the whole court. Under these circumstances, as counsel for the demandant, in a foreign country, the counsel feel it their duty to ask for a re-argument; the more particularly, as it appears from an affidavit now submitted to the court, that a sister of the demandant, who is now and long has been a feme covert, in case of a decision, upon the construction of the will, in favour of the demandant, is not subject to the disability of alienism, and may therefore maintain a suit to recover the property in dispute."

Mr Wirt objected to the re-argument, alleging, that should it be allowed, it would establish a precedent which would render every decision of the court uncertain; and incumber the court with heavier duties than it could perform. It was without example in the whole course of the court since its organization.

[Inglis *vs.* The Trustees of the Sailor's Snug Harbour.]

Mr Chief Justice MARSHALL delivered the opinion of the Court.

The court have considered the application for a re-argument in this case. It must be a very strong case, indeed, to induce them to order a re-argument in any of the causes which have been once argued and decided in this court. The present case has been very fully considered, and the court cannot perceive any ground in the present application, to induce them to consent to the motion. It is therefore overruled(*a*).

(*a*) In the Appendix will be found the opinion of Mr Justice Story, prepared in the case of the Baptist Association *vs.* Hart's Executrix, 4 Wheat. 1, which, by his liberal kindness, the Reporter has been authorised to insert in this volume. It will be found to illustrate very fully some of the principles decided in this cause.